## James Chelton vs. The State of Maryland.

*Indictment for Larceny—Hearsay and irrelevant Evidence—Bias of Witness against a Prisoner may be shown; but the Causes of such Bias cannot be inquired into—Inadmissible evidence.*

Case where irrelevant testimony was excluded, the counsel offering it declining to explain its purpose.

In the trial of an indictment for larceny the main facts upon which the defence rested, were that the first time the prisoner ever saw the stolen property it was in the possession of G. E. T., who showed it to the prisoner, putting it on a horse for that purpose. HELD :

1st. That the declarations of G. E. T. made at the time, as to his ownership of the property and that he had bought it from a negro, (G. E. T. not having been called to contradict the testimony in regard to the possession of the property by him,) were hearsay and inadmissible.

2nd. That the testimony of the prisoner himself (in reply to a question by his counsel,) as to certain statements made to him by G. E. T. at the time he showed him the stolen property, and as to the remarks of certain by-standers was properly excluded by the Court, upon the statement of the counsel for the prosecution that he had not heard or understood the witness' reply to his counsel's question.

3rd. That evidence offered by the prisoner as to the house of G. T. having been searched by the owner of the stolen property was properly excluded, the witness not undertaking to testify to the fact from his own knowledge, but from what he said had been told him by the members of G. T's family.

The prisoner having testified that two of the prosecuting witnesses had a grudge against him, was asked by his counsel "to state the grounds of that grudge;" on objection, it was HELD :

That the question was inadmissible.

While it is competent to prove that a witness for the State has a bias or ill-will against a prisoner, so that the jury may know what weight is to be

given to his testimony, it is altogether inadmissible to go into any inquiry as to the causes or circumstances which have created such bias.

In a criminal prosecution it is not competent or admissible to prove that one of the State's witnesses had made threats against the prisoner's brother which were not connected with threats against the prisoner.

In the course of the examination of the prisoner as a witness, he was asked by his counsel "if the father of J. T. and G. E. T. had made any threats against the prisoner's father's family." G. E. T. had not been examined as a witness, and there was no proof to show that J. T. had any knowledge of such threats at the time he gave his testimony. On objection to the question, it was HELD:

That it was inadmissible.

The prisoner proved by two of the State's witnesses upon their cross-examination, that they had expressed to L. their willingness, for a bribe, to leave the State and not appear as a witness against the prisoner. Upon the subsequent examination of L. on behalf of the prisoner touching his negotiations with said witnesses in regard to the matter of the bribery, it was HELD:

That his motives and purposes in the transaction were not admissible in evidence.

APPEAL from the Circuit Court for Somerset County.

The case is sufficiently stated in the opinion of the Court.

The cause was submitted to BARTOL, C. J., BOWIE, GRASON, MILLER and ALVEY, J.

*Thomas S. Hodson, John H. Handy* and *John W. Crisfield,* for the appellant.

*Attorney General Gwinn,* for the appellee.

BARTOL, C. J., delivered the opinion of the Court.

The appellant was indicted and convicted for the larceny of "*a set of harness,*" the property of Nathan J. P. Tull.

The questions presented by his appeal arise upon *seven* bills of exception, taken to the rulings of the Circuit Court on the admission of evidence offered in behalf of the prisoner, and will be disposed of in their order.

*First Exception.*—There was no error in the ruling stated in this exception. The evidence offered was not *per se* admissible, being altogether irrelevant and immaterial.

In the exercise of its discretion, the Court required the prisoner's counsel to explain its purpose, and afforded them an opportunity of stating in what manner they proposed to connect it, by other evidence which they expected to produce, with the questions at issue, or proper for the consideration of the jury, this they declined to do ; and failed to show its pertinency. In our opinion the testimony offered was irrelevant, and we therefore affirm the ruling of the Circuit Court in this exception.

*Second Exception.*—To understand the question raised by this exception, it is necessary to refer to the evidence which had been offered on the part of the State. It had been proved by *Nathan J. P. Tull,* that in the autumn of 1874, he lost a set of harness worth about twenty dollars, which was taken by some one from his carriage house in Somerset County, near "Marion Station," where he had placed it. In the summer of 1875, he was notified by one *William Outen* that he had the harness at George Tull's, where he, Outen, lived, and witness went to George Tull's, found his harness hanging in the kitchen and carried it home. *William Outen* testified that about the last of June, or last of August, 1875, one *Oliver Merrill* came to the house of George Tull, where he was in the habit of visiting, and asked witness to go with him to see the prisoner, James Chelton ; that the next morning witness and Merrill went to the house of the prisoner's father, a distance of several miles and there saw the prisoner. That Merrill told the prisoner that he could not pay him,

the prisoner, for the harness he had sold him, Merrill, and as he had requested payment several times, and he, Merrill, could not comply he desired to return the harness to the prisoner; that the prisoner then said he had no use for the harness, and asked witness, Outen, if he did not want it, and requested witness to go to Merrill's house in Worcester County and get the harness, which witness did, and took the harness to George Tull's house, and subsequently informed Mr. Nathan Tull he had his harness, who afterwards went to George Tull's house and got it.

*Oliver Merrill* testified that in the autumn of 1874, the prisoner sold him a set of harness, which he had not paid for, and by the prisoner's direction delivered it to William Outen, as Outen testified. Witness also testified to the same conversation of prisoner, at the house of prisoner's father, which Outen detailed. He further testified that prior to the sale of the harness to him by the prisoner, he received a message from the prisoner inquiring if he wished to buy a set of harness, and appointing to see him at George Tull's, on a certain morning; that prisoner was early in the morning of that day at George Tull's, and witness saw him, but did not speak to him at that time; that prisoner disappeared and delaying to return, witness concluded to start, that he saw George Edward Tull, a son of George Tull, who lived at his father's, hitch his, witness' horse to the buggy and rode off, but witness did not know why or where he was going; that witness came out of the house of George Tull, and saw the carriage down the lane, out of which he, witness was to go, that he and James Tull walked down the road or lane, about a quarter of a mile from the house, till they came to the buggy, where they found the prisoner, and that the harness was under the seat of the buggy; that the prisoner asked witness when he came up, what he would give for the harness, when witness asked the prisoner what he asked for it, who replied that he might have it for sixteen dollars;

that after some talk witness agreed to give fifteen dollars for the harness, and took it home with him. Witness did not see George Edward Tull at the house at that time, but thought he was uot far off.

*James Tull* testified that on the occasion spoken of by Merrill, he went with Merrill to the buggy down the lane, and heard the conversation between Merrill and the prisoner, as testified to by Merrill, and that the prisoner sold the harness to Merrill for fifteen dollars, Merrill gave the prisoner fifty cents on it, which was all the money he saw paid.

It appeared in proof that the witnesses *Outen* and *Merrill* were nephews of *George Tull;* and that *James Tull* and *George Edward Tull* were sons of George Tull, and lived with their father, who had also two unmarried daughters living with him.

The witnesses *Outen* and *Merrill* both stated on cross-examination, that being approached by John O. Lankford, and asked for what amount they would leave the State, before the meeting of Court; they had expressed their willingness, if the prisoner's father would pay them two hundred dollars each, to leave the State before Court. The State having rested its case, the prisoner was called to testify on his own behalf, and stated that the first time he ever saw the harness, for the larceny of which he was on trial, was at George Tull's house, when George Edward Tull, a son of George, said to the prisoner "that he had bought a set of harness from a negro, and in a few minutes could show it to the prisoner," which he did, putting it on a horse and asking the prisoner what it was worth, stating that he "had given fifteen dollars for it, or promised to give it," that the prisoner said he was not familiar with harness value, but supposed it was a low price for the harness, that the women of the household were standing round in the yard at the time, and asked him "what he thought of George Ed's harness."

The witness was then asked by his counsel "from whom he, said George Edward Tull, said he bought it?" when the State's attorney objected, and stated that he had not heard or understood the witness to make any statement about it as proceeding from George Edward Tull or the women; "whereupon the Court sustained the objection, and on the statement of the State's attorney that he had not heard or understood witness' reply to his counsel's first question, *excluded all that the* witness had stated about the declarations of George Edward Tull or the women, the same being hearsay." To this ruling and the exclusion of such testimony the prisoner's counsel excepted.

There was no error in overruling the question asked of the witness "from whom did Tull say he had bought the harness?" Such an inquiry was not only irrelevant, but it was objectionable also as proposing to introduce mere hearsay testimony, and for the same reason the declarations of the women were properly excluded. The prisoner's counsel have argued that the declarations of Tull were admissible, in so far as they showed that he claimed to be the owner of the property, that such declarations accompanying his possession and the exhibition of the harness to the witness as his own ; formed part of his act and ought to have been admitted as part of the *res gestæ.* But the declarations were in themselves altogether immaerial to the questions at issue. The jury were not trying the question of George Edward Tull's ownership. The main facts on which the defence rested, so far as this testimony was concerned, were that the first time the prisoner ever saw the stolen property, it was in the possession of George Edward Tull who showed it to the prisoner, putting it on a horse for that purpose. Of this testimony the prisoner had the benefit, George Edward Tull was not called to contradict him, it would not be in any manner strengthened by proving the declarations made by Tull at

the time, as to his ownership and that he had bought the harness from a negro for fifteen dollars. Such declarations constituted no part of the *res gestæ*, they related only to distinct collateral matters, not involved in the issue before the jury, and were obnoxious to the objection that that they were only hearsay evidence. In our opinion there was no error in the rulings of the Circuit Court set out in this bill of exceptions.

*Third Exception.*—The evidence offered by the prisoner, as to the house of George Tull having been searched by Nathan Tull for the stolen property, was properly excluded. The witness not undertaking to testify to the fact from his own knowledge, but only from what he said had been told him by the members of George Tull's family.— This was only hearsay and therefore clearly inadmissible.

*Fourth Exception.*—The prisoner testified that the witnesses Outen and Merrill had a grudge against him, and was asked by his counsel to "state the grounds of that grudge," objection being made the Circuit Court sustained the objection, and this ruling forms the subject of the *fourth* bill of exceptions; we find no error in this action of the Circuit Court. The rule is well settled that while it is competent to prove that a witness for the State has a bias or ill-will against a prisoner, so that the jury may know what weight is to be given to his testimony, it is altogether inadmissible to go into any inquiry as to the causes or circumstances which have created such bias. This as has been correctly argued by the Attorney General would introduce into the trial innumerable side issues, not pertinent or proper for the consideration of the jury.

*Fifth Exception.*—It was not competent or admissible to prove that the State's witness *James Tull* had made threats against the prisoner's brother; which were not connected with threats against the prisoner, such evidence was irrelevant and properly excluded.

*Sixth Exception.*—In the course of the examination of the prisoner as a witness, he was asked by his counsel, "if the father of James Tull and George Edward Tull had made any threats against the prisoner's father's family?"

We think this question was properly overruled. George Edward Tull had not testified in the case and there was no proof to show that *James Tull* had any knowledge of such threats made by his father at the time he gave his testimony, the question was wholly irrelevant and inadmissible.

*Seventh Exception.*—John H. O. Lankford testified on behalf of the prisoner, among other things, that the witnesses *Merrill* and *Outen* had proposed to him, to leave the State and not appear at Princess Anne, and testify against the prisoner, if the father of the prisoner would pay each of them a sum of money; that neither the prisoner nor his father was aware, to witness' knowledge, of such proposition; that witness made an appointment with said witnesses Outen and Merrill to negotiate the said agreement to leave the State, and not to testify, and did offer them a sum of money on account of the sum by them agreed upon, but that they refused to take less than the sum agreed upon, and left the house; that said interview was in the parlor at the house of prisoner's father; he was then asked the following question : "*Did you intend at any time during the negotiation with Merrill and Outen to pay them* $350, *or* any other sum not to appear as witnesses against the Chelton boys?" The witness answered "that he did not."—Objection being made by the State's attorney to this question and answer, the Circuit Court sustained the objection and ruled out the testimony,—and the prisoner excepted. The witness was then asked by the prisoner's counsel the following question: "What was your purpose in holding the negotiation with Merrill and Outen you have detailed in your evidence?"

The State's attorney objected to the question, the objection was sustained, and the evidence was ruled out.    These rulings form the subject of the *seventh* bill of exceptions. In our opinion the evidence was properly excluded.    The motives and purposes of the witness Lankford were not material or proper subjects of inquiry.    The prisoner had proved by the State's witnesses Outen and Merrill on their cross-examination, that they had expressed to Lankford their willingness for a bribe to leave the State and not appear as witnesses against the prisoner, and he had the benefit also of Lankford's testimony to the same effect, that *Outen* and *Merrill* had approached him making this unjustifiable offer, such evidence tended to impeach those witnesses.    The motives and purposes of Lankford in the transaction to which he testified were not pertinent or material for the defence of the prisoner, nor do we perceive on what ground such an inquiry could be admissible.

Finding no error in the rulings of the Circuit Court, they will be affirmed.

*Rulings affirmed.*