WILLIAM J. MULLEN *vs.* MARGARET McKEON, EX'X.

PROVIDENCE—JULY 3, 1903.

PRESENT: Stiness, C. J., Tillinghast and Douglas, JJ.

(1)   *Wills.   Undue Influence.*

Where the evidence showed that beneficiary induced deceased, while in an intoxicated and helpless condition, to leave his lodgings and go to her house;   that she obtained possession of his bank book when deceased was too ill to write his name;   that she took charge of him during his illness;   sent for the lawyer to draw the will, and was the only other person present when it was drawn;   obtained a witness to attest it;   did not disclose that deceased had a wife and child living, and at the trial did not offer herself as a witness:—

*Held*, that a verdict sustaining the will would be set aside.

PROBATE APPEAL, after verdict sustaining will.   Heard on petition for new trial, and petition granted.

TILLINGHAST, J.   The question presented for our determination in this case is whether the verdict of the jury, whereby an instrument in writing purporting to be the last will and testament of William H. Mullen was found to be his will, is against the evidence.

The substantial facts in the case, in so far as they are material to our decision, are as follows:

For about two weeks prior to the fatal illness which very speedily resulted in his death, the testator had been in a continued state of intoxication.   For several months previous, and up to within a week of his death, he had been lodging at No. 39 North Main street, with one Llewellyn Jones, who kept a

lodging-house there. For a week before leaving this place he had been continually intoxicated. While in this condition a woman whom he introduced to Mr. Jones as his "female friend," and who, it is not denied, is the Margaret McKeon named in the will as sole legatee and executrix, accompanied him to his lodging-place aforesaid, where she superintended the packing of his trunk and took him away with her. He was so drunk at the time that he could not pack his things, and while she was doing this for him he was crying, whining, and lamenting over his condition, and evidently had but little control over himself either physically or mentally, but simply acted at the beck or suggestion of this woman. He gave no reason for leaving the place. He was in a condition at that time to be easily influenced, and was evidently wholly under her control. Mrs. McKeon was seen in his company several times during this last spree of his, and on Saturday, May 31, 1902, they were together in the Board of Trade building to see a Mr. De Wolf, who was a chum of Mr. Mullen, to get him to assist in getting Mullen's money out of the savings bank. This was the same day that the testator left his lodging-house, as aforesaid.

De Wolf saw the condition that Mullen was in, and notified the treasurer of the savings bank not to let him have his money. Mullen made several subsequent attempts to get his money through De Wolf, but the latter put him off and kindly kept him from drawing it. Mullen's condition at these times is illustrated by the following testimony of De Wolf: "Q. Did he have any crying spells? A. Yes; he would come in and go into the back room in the basement, or into the fire-room, and sit down and cry like a child, and say, 'My God, Lou, what will I do?' And he seemed to worry about his boy. He wanted to get clear of this lady and go away. . . . Q. What do you know about his relations between' himself and his son? A. His sole talk when we were alone was about his boy. Q. What would he say? A. He would tell about how good a boy he was, and how he had helped him along, and how it was he was so good a boy. . . . Q. Have you heard

Mr. Mullen say anything about his estate, what he intended to do with it? A. He told me that he had enough to bury him decently and that he wanted the boy, Billy, to have the balance."

On Tuesday evening, June 4th, Mullen was found, with all his belongings, in Mrs. McKeon's house, where he was shortly afterwards taken violently sick with pneumonia, and where he died early on the following Sunday morning.

On the 7th day of June Mrs. McKeon sent for Patrick H. Mulholland, Esq., a lawyer of this bar, to come to the house for the purpose of drawing a will for Mr. Mullen. In response to this call Mr. Mulholland went to the house, and after a few minutes conversation with Mullen, who was very sick in bed, the latter said to the lawyer, "I want her to have all I've got." He referred to Mrs. McKeon, who was then in the room. He also spoke in relation to a small deposit that was in the bank, and said he would like to have it arranged so that some of it could be drawn out to be used by him for necessaries. Mrs. McKeon then brought in the bank book, and the attorney prepared an order making the deposit payable to her, to which order, after an ineffectual attempt on the part of deceased to sign his name, it was written for him and he made his mark.

After the will was drawn Mrs. McKeon went out and procured a neighbor, Mrs. Hayden, as one of the witnesses.

The will was signed by the testator making his mark, and was witnessed by Mr. Mulholland and Mrs. Hayden. By the terms of the will all of the property of the testator was devised and bequeathed to her, and she was made executrix of the will without being required to file a bond or return an inventory.

At the time of the making of the will the testator had a wife and an adult son living, but he did not mention either of them in his will, nor did the lawyer who drew the will know of their existence or that the deceased was a married man. On the contrary, he testifies that he supposed the deceased was a single man. The testator had not lived with his wife for many years, but he was on the best terms with his son.

The testator had been committed to the State workhouse twenty times between 1883 and 1895 as a common drunkard,

and he had had delirium tremens about two-thirds of the time between those dates. This disease, according to the testimony of Dr. George F. Keene, a well-known expert upon insanity, and the superintendent of the insane hospital at the State institutions for about twenty years, "is a delirium and a tremor. Delirium is the mental phase of it, and the tremor is the physical, and it is produced by prolonged drinking." In answer to the question as to what symptoms delirium tremens manifests, he said: "A man has wild deliria and hallucinations of scene. He sees and hears things, and is in a state of fear of everything about him, and shakes; and in this case, the last time I saw him he had an attack of pneumonia and was very seriously ill, so ill we didn't think he would live, but he recovered. Q. What brought on the pneumonia? A. The result of alcohol. Q. What effect does it have upon a man's mental capacity— an attack of delirium tremens? A. A man is incapable of continued thought. His memory is interfered with, and his attention. There is no attention to his person, and he is in a state of abject fear. Q. Does the occurrence of the attacks of delirium tremens affect a person so as to make him more subject to the effects of alcohol as they go on? A. If one has had two or three attacks of delirium tremens he is more liable to have them than if he hadn't had them. Q. If he were suffering from alcoholism and delirium tremens would he be capable of transacting business? A. He would not. Q. How would he be as to being influenced by another person? A. I should say he would be very easily influenced. Q. And how would he be as to testamentary capacity? A. It would be impaired. Q. Did you see him after the period he left your place and after he had reformed? A. Yes; I used to see him quite frequently. He used to come up and speak to me on the street, and we all considered it a very remarkable case of reform. I think what caused his reform was the nearness to death to which he came in 1894. I had a talk with him and told him that he never would go through such a condition as that again. . . . Q. What are these crying spells—what do they indicate after a man has been drinking? A. Undue stimulation of the emotions, and always a symptom of mental weakness.

Q. You have heard Mr. Mullen's condition described here by the witnesses when he was under the influence of liquor and was mentally and physically weak, and from what you have seen of the man and knew of him, what would you say as to his mental condition at such times as to being subject to be influenced by others? A. Knowing the man as I knew him, and having seen him as I saw him up to 1895, I should say if he was under the influence of liquor he was in no condition to transact business and would be easily influenced. He was always very easily influenced, and would do anything I wanted him to at the institution. Q. If the evidence in this case showed that he had an only son with whom he was on good terms, and he left all of his estate, small as it was, to a woman with whom he had boarded only a week at the time, and while he was in a condition, as it has been stated, what would you say as to his mental capacity from the testamentary standpoint? A. I should doubt his testamentary capacity, certainly."

The testator's son, William J. Mullen, was not notified of his father's illness, although the latter well knew where he resided. After learning from an outside source of his father's death, the son went to Mrs. McKeon's house and saw the body, and asked Mrs. McKeon if his father did not offer to send for him, to which she replied—"'Yes; but I didn't know what part of Attleboro you lived in.' Q. Did she say when he told her to send for you? A. I think either Thursday or Friday." The testator and his son had always been on the best of terms, and the former had frequently told his son that if anything happened to him there was five hundred dollars going to the son, and that he (the father) had enough in the bank to bury him with. Mrs. McKeon did not mention the matter of the will or the bank book to the son. At the trial of the case Mrs. McKeon did not appear as a witness.

In view of the foregoing statements of fact and testimony, two things plainly appear. And the first thing which thus appears is that the will in question was a very unnatural one, and was also contrary to the testator's repeatedly expressed intentions. His son was the natural object of his bounty, and,

in the absence of any proof or explanation to the contrary, it is to be inferred that if he had been in the possession of his faculties, and in the exercise of his own free will and choice, he would have bestowed his property upon his son instead of giving it without reserve or qualification to one who had no claim upon his bounty, and who, so far as appears, was practically a stranger to him up to within about a week of his death. And that he was in his right mind and not under the influence or control of another, when he thus disregarded every feeling of natural affection and duty, is a proposition so unreasonable and so obnoxious to our sense of right and duty, that we cannot accept it as true under the evidence in this case.

"Where the will is unreasonable in its provisions and inconsistent with the duties of the testator with reference to his property and family, or what the civilians denominated an inofficious statement, this of itself," says Mr. Redfield (see Redf. on Wills, part 1, 515), "will impose upon those claiming under the instrument the necessity of giving some reasonable explanation of the unnatural character of the will, or, at least, of showing that its character is not the offspring of mental defect, obliquity, or perversion." See *Clark* v. *Fisher*, 1 Pai. 171.

The rule upon this subject is very carefully defined by Chief Justice Buchanan, in *Davis* v. *Calvert*, 5 Gill. and J. 302, thus: "A testator should enjoy full liberty and freedom in the making of his will, and possess the power to withstand all contradiction and control. That degree, therefore, of importunity or undue influence which deprives a testator of his free agency, which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act, is sufficient to invalidate it."

The second thing which plainly appears is that there must have been undue influence exerted upon the testator to cause him to make such a will. The circumstances of its execution, taken in connection with the silence of the sole beneficiary thereunder at the trial, are wholly inconsistent with any other hypothesis than the existence of such undue influence. And that the testator was under the control of Mrs. McKeon in the

making of this will is so apparent from the evidence produced as to leave little room for doubt as to the existence and potency of such control. It is true that there is no positive or direct testimony to this effect, nor should we ever expect to find any in a case of this sort. But the inference to this effect being, as it seems to us, the only natural and reasonable one which can be drawn from the testimony produced, the duty of the jury was to find accordingly.

In *Sears* v. *Shafer*, 6 N. Y. 268, the court said that undue influence will be inferred from the nature of the transaction alone in some cases; in others, from the nature of the transaction and the exercise of occasional or feeble influence. In *Rollwagen* v. *Rollwagen*, 63 N. Y. 519, Judge Rapallo says: "Undue influence is not often the subject of direct proof. It can be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the condition of his health and mind, dependency upon and subjection to the control of the person supposed to have wielded the influence, the opportunity and disposition of the person to wield it, and the acts and declarations of such person." Numerous authorities are cited by Judge Rapallo in support of the position thus taken. In *Tyler* v. *Gardiner*, 35 N. Y. 559, Judge Porter says: "It is no sufficient answer to the presumption of undue influence, which results from undisputed facts, that the testator was aware of the contents of the instrument and assented to all it provisions; this was the precise purpose which the undue influence was employed to accomplish." And in *Huguenin* v. *Baseley*, 14 Ves. 273, Lord Eldon says: "The question is not whether she knew what she was doing, had done, or proposed to do, but how the intention was produced." See also *Van Kleeck* v. *Phipps*, 4 Redf. Rep. 99; *Haydock* v. *Haydock*, 33 N. J. Eq. 494; *Wilson's Appeal*, 99 Pa. St. 545; *Gay* v. *Gillilan*, 92 Mo. 250; *Potter's Appeal*, 53 Mich. 106; *Fagan* v. *Dugan*, 2 Redf. Rep. 341; *Burke* v. *Nolan*, 1 Demar Rep. 436; *Delafield* v. *Parish*, 25 N. Y. 95.

In *Dale* v. *Dale*, 38 N. J. Eq. 274, it is held that where one is in a position to exercise an improper influence over the testator,

and the will is unnatural and in his favor, the burden is upon such person to show that it was executed without the exercise of undue influence by him.   See also *Clark* v. *Fisher*, *supra*, at p. 174, and Taylor on Evidence, § 160.   In Jarman on Wills, 1st ed. vol. 1, p. 49, the author says: "In cases of weakness of mind, arising from the near approach of death, strong proof is required that the contents of the will were known to the testator, and that it was his spontaneous act. A suspicion is justly entertained of a will conferring large benefits on the person by whom, or by whose agent it was prepared, or of a will in favor of a medical attendant in whose house the testator resided."

(1)     These authorities, and many others which may be cited, show that courts look with a jealous eye and strong disfavor upon wills which are made under such suspicious circumstances as was the one before us;   and require the fullest explanation of so unnatural a disposition of one's estate.   Here, the undisputed evidence shows that Mrs. McKeon induced the deceased, while in an intoxicated and practically helpless condition, to leave his lodgings, which he had occupied for a considerable time, and which, for aught that appears, were satisfactory to him, and go to her house;   that she obtained possession of his bank book and was present when it was transferred to her by the deceased, who was so ill that he could neither write his name nor hold the pen;   that she took charge of him during his illness;   that she sent for the lawyer to draw his will, and was the only person present, excepting the lawyer, when it was drawn;   that she obtained a witness to attest it;   that she did not inform the lawyer that the testator had a wife and son who were then living;   and that she gives no explanation of the strange and very unnatural conduct of the deceased in giving her all of his property, or of her strange conduct in taking him from his former lodgings, while in the condition aforesaid, and providing a place for him in her own home.   These things are so inconsistent, not only with propriety of conduct on her part, but also with honest purpose, that the inference is well-nigh conclusive that the testator must have been under her control, both physically

and mentally, from the time when she thus took him to her home until the time of his death, and hence that the will in question was practically her will, and not his.

In view of these facts, we think that the verdict of the jury was clearly against the weight of the evidence.

We do not wish to be understood, in what we have thus said, as casting any suspicion on the fidelity or fair dealing of the counsel who drew the will. "For," as said by the court in *Van Kleeck* v. *Phipps, supra,* "whatever undue influence has been exercised over a testator, that influence has taken effect before the instructions to prepare the will, and has been carefully kept from the draughtsman, with the knowledge that if exhibited or suggested to him, it would wholly defeat the unlawful purpose."

The verdict is set aside, and new trial granted.

*John W. Hogan and Philip S. Knauer,* for appellants.
*P. H. Mulholland,* for appellee.