(87 Misc. Rep. 577)

### In re KNIGHT'S WILL.

(Surrogate's Court, New York County. November 30, 1914.)

1. WILLS (§ 55*)—TESTAMENTARY CAPACITY—SUFFICIENCY OF EVIDENCE.
   Evidence in a will contest *held* to show that testatrix, though almost in articulo mortis from cancer, possessed testamentary capacity at the time of the execution of her will.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

2. WILLS (§ 52*)—TESTAMENTARY CAPACITY—BURDEN OF PROOF.
   Where a will was contested on the ground of testamentary incapacity, the burden was on the proponents to prove that testatrix was competent to make her will at the time of its execution.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 101–110; Dec. Dig. § 52.*]

3. WILLS (§ 55*)—DEATHBED WILL—TESTAMENTARY INCAPACITY—QUANTUM OF PROOF.
   While a deathbed will is subjected to closer scrutiny than others, proofs of physical weakness, followed by a will made near death, are alone insufficient to establish testamentary incapacity.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 137–158, 161; Dec. Dig. § 55.*]

4. WILLS (§ 50*)—"TESTAMENTARY CAPACITY"—REMEMBERING RELATIVES.
   The rule that it is essential to testamentary capacity that testatrix comprehend her relations to the persons who might be the objects of her bounty does not require that she remember all the distant relatives, who might take a portion of her property if she were to die intestate.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 96–100; Dec. Dig. § 50.*
   For other definitions, see Words and Phrases, First and Second Series, Testamentary Capacity.]

5. WILLS (§ 289*)—PROBATE—SUBSCRIPTION—BURDEN OF PROOF.
   Under the express provisions of Decedent Estate Law (Consol. Laws, c. 13) § 22, the burden was on proponents to show in the first instance that a will offered for probate was subscribed by testatrix or by another at her request.
   [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 653–661; Dec. Dig. § 289.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. WILLS (§ 111*)—SUBSCRIPTION—"DIRECTION."
Where it is suggested in testatrix's presence that her hand be guided by one of the attesting witnesses in the writing of her signature, and testatrix gives her tacit consent to such assistance, this constitutes a sufficient "direction," within Decedent Estate Law, § 22, providing that the subscription to a will shall be by testatrix, or by another who signs her name by her direction.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 267–275; Dec. Dig. § 111.*

For other definitions, see Words and Phrases, First and Second Series, Direction.]

7. WILLS (§ 111*)—"SUBSCRIPTION."
That testatrix's hand, with her tacit consent, is guided by a subscribing witness in the making of her signature, does not prevent the "subscription" from being hers, within Decedent Estate Law, § 22, providing that one of the two kinds of authorized subscriptions shall be a subscription by testator.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 267–275; Dec. Dig. § 111.*

For other definitions, see Words and Phrases, First and Second Series, Subscribe.]

8. WILLS (§ 163*)—CONTEST—UNDUE INFLUENCE—BURDEN OF PROOF.
Where a will is contested on the ground of undue influence, the burden is on the contestants to establish their contention.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 388–402; Dec. Dig. § 163.*]

9. WILLS (§ 166*)—CONTEST—UNDUE INFLUENCE—QUANTUM OF PROOF.
Where a will is contested on the ground of undue influence by innocent agents deriving no benefit from their acts, the proof to establish undue influence must be of a high order.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

10. WILLS (§ 166*)—CONTEST—UNDUE INFLUENCE—SUFFICIENCY OF EVIDENCE.
Evidence in a will contest held insufficient to show that the execution of the will was procured by undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

11. WILLS (§ 155*)—"UNDUE INFLUENCE"—"URGENCY."
"Urgency" to make a will is different from coercion to make a will in a particular manner, which is "undue influence."

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*

For other definitions, see Words and Phrases, First and Second Series, Undue Influence.]

12. WILLS (§ 288*)—CONSTRUCTION—INTENTION—PRESUMPTION.
A will is presumed to express the testatrix's real intention.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 651, 652, 662, 664; Dec. Dig. § 288.*]

In the matter of the probate of the will of Sarah A. Knight. Decree for proponents.

Harold Swain, of New York City (Edward S. Clinch and Robert W. Cromley, both of New York City, of counsel), for proponents.

Osborne, Lamb & Garvan, of New York City (James W. Osborne

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

and Gilbert D. Lamb, both of New York City, of counsel), for contestants Murphy and others.

Maxwell Hall Elliott, of New York City, for general guardian of contestant Oberhelman.

Wing & Russell, of New York City, for contestants Burmann and others.

Samuel J. Wagstaff, of New York City, special guardian for Kenneth P. and Robert P. McLaughlin.

William J. Burke, of New York City, special guardian for Charles E. Ford and others.

FOWLER, S.   The probate of the paper propounded as the last will and testament of Sarah A. Knight is contested by distant cousins of the deceased on the usual grounds, want of testamentary capacity and undue influence.   The case has been ably presented and closely.

Sarah A. Knight, the alleged testatrix, was an unmarried woman of some 70 years of age at the time the testamentary instrument here propounded came into being.   Miss Knight had of late years no near relatives; her parents and her brothers, from whom she derived her large estate, having predeceased her.   This estate so inherited from her brothers she augmented by her extraordinary prudence, business sagacity, and thrift.   When she died testatrix had no dependents.   She was absolutely free from moral obligations to any of her kindred, and at liberty to do what she liked with her own, not only by law, but by every other principle.   There can be no doubt from the testimonial evidence that up until her last illness Miss Knight was a woman of unusual shrewdness, sagacity, and mental force.   She was a thorough woman of business, prudent and careful in the extreme, and she was exceptionally economical, as I detect from certain circumstances shown in evidence.

For some 20 years prior to her demise it appears that Miss Knight had business relations with the Title Guarantee & Trust Company and its affiliated companies, carrying on business in this city and county. She kept a deposit account with such trust company, and purchased mortgage securities through them of the Bond & Mortgage Guarantee Company, an affiliated concern.   The head of these several companies, Mr. Kelsey, seems for a long period to have acted as Miss Knight's general business adviser, or, at least, she frequently consulted him in regard to her affairs.   It was this gentleman who prudently sent Miss Knight to the hospital, where she died, and it was he who had advised her some six or seven months before her death to make a will, disposing of her large estate.   A hospital, in her case, was a proper abode for a serious illness, as she had no family, and, I think, kept no attendant or servant at her apartment although she could very well afford to indulge herself in the best service.   It was on September 4, 1913, by Mr. Kelsey's suggestion that Miss Knight, being then very ill, was taken from the Title Company's office to St. Luke's Hospital in this city.   She went to the hospital under the care of several young men in the employment of the Title Company or its affiliated companies, and at that hospital she died on the 13th of October follow-

ing. Barely two days before her death the paper now propounded as her last will came into being.

[1, 2] The first question made on the paper propounded is this: Was testatrix at the time it was executed competent to make her will? On this issue the burden of proof is on proponent. Cases cited in Re Gedney's Will, 142 N. Y. Supp. 157, 161. There is no pretense that at the time Miss Knight entered the hospital she was not possessed of testamentary capacity. The issue, therefore, in this case narrows itself to her capacity at the moment of the act of testamentation. This occurred on the 11th day of October, 1913, at about 3 o'clock p. m., not quite two days before Miss Knight's death and a calendar month and seven days after her entry into St. Luke's Hospital. At the time she entered the hospital the powerful mind of testatrix was in perfect order, notwithstanding her physical malady. If from a state of testamentary capacity, Miss Knight lapsed into a state of incapacity, such incapacity resulted between September 4, 1913, and October 12th of the same year.

The testamentary paper in question was attested by the head nurse of the hospital, Miss Missimer, and by Mrs. Mackey, the wife of a beneficiary and the executor named in the disputed will. It appears that Mrs. Mackey, who lived in the West, had been sent for to come to New York to look after Miss Knight. Her name was mentioned for that purpose by testatrix herself. Mrs. Mackey was not an intruder. From September 13, 1913, until Miss Knight's death, Mrs. Mackey was in attendance on the sick woman by and with her voluntary consent. I saw both the attesting witnesses on the witness stand, and to my mind their testimony that Miss Knight was, on the 11th day of October, 1913, and at the moment of execution, competent to make a will, is entitled to great weight in this particular case. It is the testimony of actual and disinterested observers. Attesting witnesses are put about a testatrix as a safeguard, and to detect evidence of mental incompetency or undue restraint and coercion. When they do their duty, and are persons of probity and neutrality, their evidence, even if matter of opinion, cannot be lightly ignored. Under some circumstances it may be conclusive. I saw no other single witness in this case more competent to form an opinion of the mental condition of the testatrix at the moment of execution on the 11th of October, 1913, than was the head nurse of the hospital, who acted as attesting witness.

It is certain that testatrix had no mental disease when she made her will. Her normally acute mind may have become somewhat less acute, but it was not proven then to be devoid of intelligence or discernment. She was doubtless then about to die of a cancer, or from the effect of its disorganizing and destructive action, and she was undoubtedly then physically very weak, even prostrate, and at times somnolent, lethargic, or drowsy, as a person almost in articulo mortis from such a dreadful malady is, I think, apt to be. Her disease may have deteriorated every physical function, but it had not come to the point of destruction of a naturally fine mind. That testatrix was not somnolent, lethargic, or drowsy at the very moment of her act of testamentation only the attesting witnesses could, I think, know, and their testimony is to

the effect that she was not so. In this they are not impeached, and in my opinion, notwithstanding the elaboration of the medical case of contestants, the fact that testatrix was not lethargic or drowsy at the moment of execution is not disproved; and, this being so, it disposes in this case of the issue of mental and testamentary incompetence.

[3] To be sure, Miss Knight's was almost a deathbed will, and in such instances in courts of this character the testamentary act is subject to somewhat closer scrutiny; but that is all. Proofs of physical weakness of testatrix, followed by a will made near death, are insufficient in themselves to establish that the mental condition was such as to incapacitate Miss Knight from making her will. Matter of Seagrist, 1 App. Div. 615, 37 N. Y. Supp. 496. No legal inference against the testamentary paper conclusively flows from the single fact that it is what is called a deathbed will.

The opinion of the nurse who acted as attesting witness is corroborated by Dr. Patterson, the chief attending physician, who thought that Miss Knight was rational on the day after the making of the will, and it is also corroborated by Miss Cameron, an attendant hospital nurse, called to the stand by contestants. Miss Cameron, about this time, attended testatrix daily, including the 11th of October, when the paper in question was executed. In answer to a question put to her on her direct examination, Miss Cameron stated that Miss Knight was never irrational. Miss Cameron was called by contestants. I cannot help concluding that the testimony of the attesting witnesses as to competency of testatrix is further corroborated generally by that of Miss Saunders, another nurse called by contestants.

The opinion of the eminent expert, who testified for contestants on a hypothesis put to her by contestants' counsel, cannot be allowed to outweigh the effect of the direct evidence of the witnesses who saw and heard the testatrix at the moment of executing the will, and who testify that she was then competent and rational. In my judgment it appears from all the evidence taken before me that Sarah Knight was competent to make her last will and testament on the 11th day of October, 1913, and at the moment of execution.

[4] The old rule regarding tests of testamentary capacity, said to be restated for us by one of the many judgments in Delafield v. Parish, 25 N. Y. 9, to the effect that testatrix must be shown to have sufficient capacity to comprehend her relations to the persons who might be the objects of her bounty, does not require that testatrix must be shown to remember all the distant relatives who in her case might be entitled in an intestate succession to take her property under the statute of distributions or the canons of descent in force in this state. It is doubtful if any highly trained lawyer, at his best moment, could offhand recall the persons so entitled. I take notice that it would be a most difficult task. Roche v. Nason, 105 App. Div. 256, 93 N. Y. Supp. 565; Matter of McCarty, 141 App. Div. 816, 819, 820, 126 N. Y. Supp. 699; In re Campbell's Will, 136 N. Y. Supp. 1096, 1097.

[5-7] It was incumbent on proponents to show in the first instance that the will offered for probate was subscribed by testatrix, or else by another at her request. The Decedent Estate Law, which con-

tains our present statute of wills, contemplates two kinds of subscrip-
tions: (1) A subscription by testator; (2) that another may sign a
testator's name to his will by his direction (section 22). Robins v. Cor-
yell, 27 Barb. 556. A question is now made whether in this case the
subscription is in fact that of testatrix, as it does not purport to be
that of another made by her direction. The attesting witnesses have
sworn that the testatrix signed her name to the will, or, in other words,
they gave prima facie proof of an actual subscription by testatrix her-
self, as required by one branch of the statute of wills. It developed
later that the hand of testatrix was guided by one of the attesting wit-
nesses, and it is claimed that the will is not subscribed by testatrix with-
in the meaning of the statute. What was said to the testatrix without
her dissent was, I think, in any event by implication, a sufficient direc-
tion by testatrix to the witness within the statute, even if the will
was not subscribed by testatrix. But it seems to me that there was
shown an implied request by testatrix for assistance and her tacit
consent to such assistance, and that the subscription to the paper pro-
pounded is in fact that of testatrix and not that of another. Vandruff
v. Rinehart, 29 Pa. 232; Matter of Kearney, 69 App. Div. 481, 74 N.
Y. Supp. 1045. The facts here are not the same as those disclosed
in Matter of Mooney, where the testatrix was unable either to sub-
scribe the will or to give direction to another to sign for her. 73 Misc.
Rep. 315, 324, 132 N. Y. Supp. 705. In other respects the paper pro-
pounded is shown to have been executed with the formalities required
by the statute of wills.

[8] Thus it is that the will offered is entitled to probate, unless the
contestants' affirmative allegation of undue influence is made out by
preponderating proofs. On that branch of the case contestants have
the burden of proof in the double sense of that term under the late
ruling in Matter of Will of Kindberg, 207 N. Y. 221, 100 N. E. 787;
Matter of Will of Falabella, 139 N. Y. Supp. 1003; In re Gedney's
Will, 142 N. Y. Supp. 157.

[9, 10] When we come to examine the proofs on an allegation of
undue influence, we first inquire who it is that is charged with the
commission of such unlawful influence. Some legitimate inferences
may be attached to the fact that such person is or is not interested per-
sonally in the will, or is or is not benefited thereby directly or indirectly.
When we find that the person or persons charged with wielding the in-
fluence derive no benefit whatever from the act complained of, it be-
comes necessary to inquire further whether the act in question is not
mere importunity or solicitation, either meddlesome or friendly, to
which the law attaches no vitiating consequences. The law does not
undertake to frustrate all interference with a testamentary disposi-
tion, but only that which in the eye of the law subverts the free will
of a testator and has a bad purpose or intention annexed to it. The al-
legation of undue influence in this matter charges that it was commit-
ted by persons unknown to the pleader. As the proofs developed it ap-
peared that, if the will was procured through the influence of any one,
it must have been through the influence of the ordinary business agents
of the testatrix herself or the hospital servants. Now these agents
and servants take nothing under the will, they had no interest in the

matter, and if they are implicitly charged with doing an unlawful act, it was so done by them without purpose and without benefit to themselves. In such a case I think the proofs should be high in order to find an unlawful coercion or undue influence by innocent agents.

[11] While there is some proof which, isolated, would look as if Miss Knight was loath to make any will at all, yet, taken in connection with other related proofs, it discloses nothing of the kind. It is apparent that Miss Knight refused to accept the verdict of the doctors that she was about to die. She knew very well that, if she was going to die, it was advisable and businesslike for her to die testate, and not intestate, and that it were well that she should herself dispose of the fortune which she had augmented by what appears to me to have been her cruel, but deliberate, self-denial. But it is evident that Miss Knight would not be hurried into making her will, and obviously, if she was not going to die, she wanted to think longer about its contents; in fact, as long as possible. She would do it later, she said, when advised to settle her affairs. Those about her alone knew how imminent her death was, and, if there was any undue urging in this case, it was directed to the testamentary act, and not to the contents of the testamentary paper. Now, an urgency to do generally what the law allows and even encourages cannot be unlawful, or, to be more specific, such urgency is not what the law intends by undue influence. It seems to me that just at this point lies the fallacy of the otherwise very able argument for contestants. It does not distinguish between an urgency to do an act which the law encourages and pressure to make a will contrary to the real testamentary intention of the testator which is the gist of undue influence.

Who is it, then, who is charged as the wielder of the undue influence? If any one in this case is charged as the responsible agent of such undue influence, it must be Mr. Kelsey, the head of the corporation mentioned, and a gentleman of whom the contestants' counsel very properly remarked on the trial of the cause, "I have absolute faith in him as a gentleman." See page 253, stenographer's minutes. It appears that Mr. Kelsey, the president of the Title Company, some months before Miss Knight's last sickness had in a perfectly proper way advised her to make her will. Incidentally she then stated to him that she had no relative for whom she cared, and then Mr. Kelsey casually suggested her giving some of her estate to charitable objects generally. At first Miss Knight would have none of it, she replied: "No; they waste all the money on salaries." She, however, asked for a list of charities to consider. That Mr. Kelsey had no influence over testatrix, and à fortiori no undue influence over her, is apparent by the abruptness of Miss Knight's consideration of his suggestions about the charities. After reading critically all the evidence, I doubt whether any living person could obtain an undue influence over testatrix. I doubt if her judgment could be influenced, except possibly by a mathematical demonstration, so firm, orderly, and superior was her normal intelligence. Miss Knight obviously was no ordinary woman at the height of her power. For a moment, but only for a moment, in her interview with Mr. Kelsey, testatrix softened, and she said:

"I had thought some time I would like to do something for children, the children of the street."

But that was the last of sentiment. So firm in the end was testatrix about the inexpediency of most charitable gifts that she declined even to talk with Mr. Kelsey about her will, because, as she said in substance, she thought he wanted her to give her estate to charity. When he heard this, her trusted friend left her still intestate, not to return. His personal connection with the case ended there. Certainly Mr. Kelsey is not guilty of the undue influence charged so vaguely in the allegation of undue influence.

There is some evidence to the effect that testatrix was erroneously informed that if she did not make her will her estate would escheat to the state. If the testatrix was incapax, as contestants assert, the misstatement was of no consequence. It is only if capax that the statement may be material. It was not the fact that Miss Knight's estate would escheat, but this was not a misrepresentation in the technical sense of being knowingly an unlawful inducement for testatrix to cut off the pretension of those distant kinsmen who were in fact her heirs at law, or, rather, her heirs presumptive. I think from the evidence that this statement had no real effect, and that in this case it does not amount to undue influence.

[12] I am convinced that testatrix made the paper propounded in her own way and at her own time, free from the influence which the law terms undue. It was in fact her will, and not that of another. From the whole testimony before me, and the indications it reveals, I am assured that at the moment when testatrix made the will she herself realized in her own quiet, reserved way that her end was probably near, and that she could not safely defer the testamentary act. But even then there was no indication of trepidation or surrender on the part of this courageous and remarkable woman. The fact was she could keep her handsome estate, the token and result in part of her sacrifices and self-abnegation, no longer, and she gave it very silently, perhaps awkwardly, and even with ill grace possibly, but certainly deliberately and with sufficient intelligence, to those of her somewhat distant kindred she liked best, or, in more accurate phrase, to those of them she disliked least. The kindred of her mother seem to have been somewhat nearer to testatrix in association and regard than those of her father. Certainly she saw more of those she benefited, and thus there is nothing unnatural or to be explained by proponents by reason of the preference Miss Knight expressed for them in her will. Miss Knight knew the contents of her will, and there is always some presumption, in the absence of proof to the contrary, that the written will of a competent testatrix expresses her real intention. I have no doubt from the evidence that Miss Knight understood the contents of her will, and understood it accurately and fully.

I have now given what I esteem to be the legal effect of the evidence presented, rather than an extended and detailed survey of the evidence itself. On the whole case, I find for the proponents, and hold that the paper propounded is entitled to probate.

Settle decree accordingly.