[Civ. No. 2561.   Third Appellate District.—February 27, 1923.]

In the Matter of the Estate of ANNIE GALLO, Deceased. ESTA F. GALBRAITH et al., Appellants, v. DARIO PANINI et al., Respondents.

[1] ESTATES OF DECEASED PERSONS—WILL CONTEST—NONSUIT—RULES. In determining whether or not in a proceeding to contest a will the evidence produced by the contestants is sufficient to require the submission of the case to the jury the same rules apply as in civil cases. Every favorable inference fairly deducible and every favorable presumption fairly arising from the evidence produced must be considered as facts proved in favor of the contestants; where evidence is fairly susceptible of two constructions, or if either of several inferences may reasonably be made, the court must take the view most favorable to the contestants; all the evidence in favor of the contestants must be taken as true, and if contradictory evidence has been given it must be disregarded; and if there is any substantial evidence tending to prove in favor of the contestants all the facts necessary to make out their case, they are entitled to have the case go to the jury for a verdict on the merits.

[2] ID. — UNJUST OR UNNATURAL WILL — INSUFFICIENT GROUND FOR REVOCATION.—A will cannot be set aside on the mere ground that it is unjust or unnatural.

[3] ID. — UNJUST OR UNNATURAL WILL — BEARING UPON COMPETENCY OF TESTATOR.—The fact that a will is unjust or unnatural has weight in determining whether a testator was mentally competent at the time of its execution or was acting under undue influence.

[4] ID.—CONFIDENTIAL RELATIONSHIP—PARTICIPATION IN EXECUTION—BURDEN OF PROOF.—The mere existence of a confidential relation between a testator and one who unduly profits by the will is not sufficient to overturn it, but when such beneficiary has actually participated in procuring the execution, the burden is on him to show that the will was not induced by coercion or fraud.

[5] ID. — PROPERTY ALREADY OWNED BY LEGATEE — DISPOSITION BY WILL—EFFECT OF.—The fact that a will attempts to dispose of a piano to an adopted child to whom it already belongs and whose ownership the testatrix knew and recognized is entitled to some consideration, however slight, as tending to show that the will was the product of a mind other than that of the testatrix.

2.  Presumption of undue influence from unnatural testamentary disposition of property, notes, 7 Ann. Cas. 894; 36 L. R. A. 737; 6 L. R. A. (N. S.) 202; 22 L. R. A. (N. S.) 1024.

[6] ID. — CIRCUMSTANCES ATTENDING EXECUTION OF WILL — PRESENCE OF BENEFICIARIES—EFFECT OF.—The circumstances attending the execution of a will by a testatrix who is dangerously ill and expecting to die, at a time when she is surrounded exclusively by those who benefit by it, are subject to close scrutiny.

[7] EVIDENCE—CIRCUMSTANCES—RULE.—In building up a case on circumstantial evidence, it is not necessary that any single fact proved, standing alone, shall establish the issue, but it is sufficient, if all the facts and circumstances given in evidence, considered together, lead to a rational inference that the ultimate fact is as alleged.

[8] ESTATES OF DECEASED PERSONS — WILL CONTEST — UNDUE INFLUENCE—ERRONEOUS NONSUIT.—In this proceeding to revoke the probate of a will, there was sufficient evidence to go to the jury on the issue of undue influence, and the granting of a nonsuit at the close of contestants' case was erroneous.

[9] ID.—WILL CONTEST—UNDUE INFLUENCE—EVIDENCE—NATIONALITY AND AGES OF TESTATRIX AND BENEFICIARY.—In a will contest on the ground of undue influence, the nationality of the testatrix and the person charged with exercising such influence and their relative ages are material matters in determining the probability of such influence having been exercised and the probable effect thereof upon the testatrix.

[10] ID.—PART ACCUMULATION OF ESTATE BY CONTESTANT.—In a proceeding to revoke the probate of a will on the ground of undue influence, the contestant children have the right to show that the property of the deceased had been accumulated in part by the efforts of one of such contestants, as tending to prove that the will was the more unnatural.

[11] ID. — POVERTY OF CONTESTANTS. — Evidence that the contestant children own little or no property is admissible, since it would be the more unnatural for a parent to disinherit a son or daughter having limited means of support than one who was in affluent circumstances.

[12] ID. — DANGEROUS ILLNESSES OF TESTATRIX — WITHHOLDING OF NOTICE FROM CONTESTANTS.—Evidence that the beneficiaries having the testatrix in charge at times of her dangerous illnesses did not notify the contestant children thereof is admissible.

[13] ID.—DECLARATIONS OF TESTATRIX.—In a proceeding by the children of a testatrix to revoke the probate of her will on the grounds of mental incompetency and undue influence, declarations of the testatrix are admissible to show her feelings and desires with respect to the contestants, and as bearing upon her state of mind.

13. Antetestamentary declarations as evidence of undue influence, notes, Ann. Cas. 1917D, 717; 3 L. R. A. (N. S.) 749.

APPEAL from a judgment of the Superior Court of San Joaquin County. J. A. Plummer, Judge. Reversed.

The facts are stated in the opinion of the court.

A. H. Ashley for Appellants.

Arthur L. Levinsky and R. J. Jeffry for Respondents.

FINCH, P. J.—The will of the decedent was duly admitted to probate and thereafter appellants filed their petition for revocation of the probate thereof. At the close of contestants' case the court granted a nonsuit and entered judgment of dismissal. The contestants have appealed from the judgment.

The contestants alleged mental incompetency, undue influence, fraud, menace, conspiracy and want of due execution. Appellants' brief is not arranged in accordance with supreme court rule VIII [177 Cal. 1, 176 Pac. ix], requiring the presentation of "each point separately, under an appropriate subheading, showing the nature of the question to be presented," but it sufficiently appears that appellants contend the evidence warrants the submission to the jury of the issues of mental incompetency and undue influence at least. It is charged that such undue influence was exercised by Dario Panini, Rose Bacigalupi, and Lena Ciari, beneficiaries under the will.

It appears from the evidence that in the year 1897 the decedent resided with her husband, Giacomo Gallo, in the city of Stockton. They had but one child, John Gallo, one of the contestants, who was then of the age of about ten years. July 24, 1897, they took into their home Esta F. Badua, now Esta F. Galbraith, the other contestant, who was then a babe in arms. Esta was treated in all respects as their own child, the fact that she was not such being concealed from her, and in 1907 she was legally adopted by them. At all times up to her death, Mrs. Gallo manifested the greatest affection for Esta and a motherly pride in her accomplishments. January 19, 1911, Giacomo Gallo died. Prior to his death he conveyed all of his property to his wife. He and a Mr. Bardoni were partners in the saloon business, and after his death contestant John Gallo took his

father's place in the management of the saloon and Mrs. Gallo later acquired Bardoni's interest therein. John continued in the management of the saloon until October, 1917, when his mother commenced an action against him for possession of the saloon, alleging that he claimed to be the owner thereof; that he refused to account to her for the proceeds of the business and threatened her life if she attempted to eject him. She recovered judgment against him and John thereafter had nothing to do with her business or the management of her affairs but engaged in business for himself in Stockton. He was married and lived with his wife in his own home.

Dario Panini occupied a room in the Gallo home from June, 1909, to the time of Mrs. Gallo's death. He began taking his meals there some time prior to her husband's death and continued to do so at all times thereafter. His laundry was sent out with that of Mrs. Gallo and he seems to have been treated as would be a member of the family. He was a barkeeper at the saloon at all times after 1911, having been employed by John. When John was ousted Panini succeeded him as manager and continued as such at all times thereafter. Under her direction he paid all bills, including grocery, household, and all other bills. She paid him wages. She was paying him "wages at the time of her death and right along." After the advent of prohibition he conducted a soft-drink place for her and received half of the profits. During the last eighteen months of her life she was ill more or less. Her brother, Peter Foppiano, who with his young daughter lived at Mrs. Gallo's home, seems generally to have taken care of her during such illnesses, though Panini sometimes took care of her and sat up with her at night "more than once." Panini testified that "during most all of that eighteen months there was not a single night that Mrs. Gallo was home that there was a woman in the house with her all night." While she was in the hospital, Panini visited her twice a day. He acted as her agent in the sale of her lease of the saloon building. He had the keys of her safe when she died. The jury would have been warranted in finding that the relations between Mrs. Gallo and Panini were confidential.

Rose Bacigalupi and Lena Ciari are surviving sisters of the decedent, both residing in Stockton. They manifested a

sisterly interest in the care of Mrs. Gallo during her illness, visiting her frequently and administering to her wants. Louis Bacigalupi, the executor, is the husband of the former sister, and Peter Ciari, a subscribing witness to the will, is the husband of the latter. The mother, a third sister, and four brothers survived the decedent. Her mother was a widow, residing in Stockton and in needy circumstances. The third sister was a widow, dependent upon her children for support.

Esta was married May 5, 1917, and she thereafter resided with her husband in Stockton until some time in 1918, when they went to San Francisco, where they thereafter resided. They seem not to have been in affluent circumstances, both being in employment and living in a small flat. During her childhood Esta was sent to grammar school and later to high school. John and his father purchased and gave Esta a piano. Mrs. Gallo knew at all times that the piano belonged to Esta and after the latter's marriage recognized Esta's right to take the piano whenever she chose, though it was left with Mrs. Gallo because Esta did not have room for it in her flat. Esta was given musical instruction and Mrs. Gallo took pride in her daughter's ability to play the piano. Both before and after Esta's marriage Mrs. Gallo was accustomed to calling her "my baby," and at all times both displayed a great affection for each other, frequently visiting each other after Esta's marriage. While residing in San Francisco, Esta wrote Mrs. Gallo regularly three times a week and frequently called her up by long-distance telephone. At one time Mrs. Gallo arranged to pay for such calls because she thought the expense was too great for Esta to pay. For many years Mrs. Gallo was in the habit of talking with her acquaintances about the good qualities of her children, especially Esta, and telling such persons that John and Esta would receive all of her property at her death. A large number of these acquaintances testified at the trial. Their testimony shows a steadfast purpose on the part of Mrs. Gallo to give her property to her children. During 1920 Mrs. Gallo was in a hospital from February 26th to March 19th; from April 19th to April 24th, and from July 10th to July 31st. She died August 27, 1920. Shortly before she was first taken to the hospital she said she had her property "all fixed up for my baby and my boy

Johnnie." April 18th, the day before the will in suit was executed, she told one of the witnesses, in the presence of Panini, that she had made a will "leaving equal shares of her estate, that she thought it was the only right way to do." Frequently thereafter and up to within a few days of her death she stated that she had willed her property to her children. The foregoing testimony was given by so many apparently disinterested witnesses that the truth thereof cannot well be doubted, even if the rule governing the disposition of motions for nonsuits did not require that full credence be given thereto. Mrs. Gallo's affection for Esta continued to the very last. The night before her death she said that "she was going to take a trip to Los Angeles and on her way back she was going to go and see her baby Esta in San Francisco."

The testimony shows that, after the termination of Mrs. Gallo's litigation with her son, their relations were friendly. He visited her on an average of once a week. She offered to assist him in his business. She gave him "jellies, mushrooms, or anything she had cooked" to take home. In 1918, in conversation with a man who had been a witness for John at the trial of the case brought against him by Mrs. Gallo, she said that "she didn't have anything against Johnnie, but against the daughter-in-law, Nellie, and [in suing him] she was doing it to protect Johnnie." John's wife died December 31, 1919. In July, 1918, she said to her son: "If you want to go in any kind of business, why come down, if I can help you, because it was your money. You are entitled to it. You made it." On this appeal it must be assumed that there was no estrangement existing at the time the will was executed.

The persons to whom the decedent's property was given by the will and the inventory values thereof are as follows: John Gallo, 160 acres of land, $12,000; Esta Galbraith, $10 and piano, $100; Lena Ciari, victrola, $75; Rose Bacigalupi, trunk, linens, and diamonds, $864; Dario Panini, residue of estate, $30,871.88. That the will is unnatural and unjust, in giving the bulk of the estate to Panini, is apparent. Esta was the owner of the piano and hence received but $10 under the will. It is most unnatural for a woman, without cause, to disinherit a daughter for whom she had entertained the greatest affection to the very last in favor of one to

whom she owed no duty or obligation. The fact that Esta is an adopted daugher rather than of the decedent's own blood is not material, because it must be assumed that the decedent acted in good faith when, in the adoption proceeding, she agreed to treat Esta in all respects as her own lawful child should be treated. (Civ. Code, sec. 226.) After adoption the two sustained toward each other the legal relation of parent and child and had all the rights and were subject to all the duties of that relation. (Civ. Code, sec. 228.)

At the time of the preparation and execution of the will the decedent was surrounded by those who benefit by its provisions, and the son and daughter had no knowledge of the serious illness from which their mother was suffering. Mrs. Gallo was taken to the hospital February 26, 1920, and it appears that an operation was performed the next day, by which a large number of gall-stones were removed. Panini testified: "Dr. Craviotto examined her and then he came out and he says exactly like that: 'Best somebody tell her to fix up her will,' or something about, before she go operation, on table. That was the first operation in February. . . . I sent for Mr. Jeffry at that time. I went and told him Mrs. Gallo wanted to see him. . . . Mrs. Bacigalupi did not tell me to go and tell Mr. Jeffry that. Dr. Craviotto told me at that time it was a very tough matter. . . . He come out and says: . . . 'The operation is awful dangerous.'" It does not appear that Panini had any conversation with Mrs. Gallo about making a will or that she directed him to call Jeffry. Jeffry went to the hospital on that day but it does not appear what, if anything, was then done relative to Mrs. Gallo's affairs. With full knowledge of the dangerous operation Mrs. Gallo was to undergo, none of the beneficiaries under the will notified John of the fact, but he was informed of his mother's condition, after 7 o'clock in the evening of the day she was taken to the hospital, by a Mrs. Gianelli, and he immediately drove out to see his mother. Mrs. Gallo returned to her home March 19th and was up and about for a month.

In the forenoon of April 19th she became violently ill again. One witness, F. J. (Joe) Green testified that Mrs. Gallo was in such agony that "she hollered to me, 'Oh, my God, Joe, what will I do, what will I do?' and she was just

about . . . to tear the nightgown off of her, . . . tore it right off at the shoulder.'' Peter Foppiano telephoned to Jeffry that Mrs. Gallo wanted to see him. Jeffry went to her home and evidently had a consultation with her. He then left the house and presumably prepared the draft of the will in question, the same being typewritten. Mrs. Bacigalupi testified that, in the forenoon of that day, Mrs. Gallo ''was sick, too sick to talk of anything. In the afternoon we took her out to St. Joseph's Home; so I think nobody can make a conversation when they are so sick to be taken out to St. Joseph's Home, I don't think so myself. She certainly felt very much better after she got to St. Joseph's Home.'' This answer was given in reply to a question as to what she and her sister talked about at Mrs. Gallo's home on the 19th. John testified that after learning of his mother's illness on the 20th of April he went to the hospital, arriving there after 7 o'clock in the evening, and that his mother then had a high fever and ''was lying there, groaning.'' The will was executed at the hospital. Mrs. Bacigalupi testified that she saw her sister sign a paper there, but she did not know whether it was a will, and that Peter Ciari and Mr. Jeffry, the subscribing witnesses, signed it. Again, John was not notified of his mother's illness but learned the next day, from someone not a member of the family, that his mother was in the hospital. Mrs. Gallo returned home on the 24th of April and seems to have suffered no further violent illness until July 10th, when she was again taken to the hospital, where she remained until July 31st. During that time a second operation was performed.

About 8 o'clock in the morning on August 26th she became very ill and apparently gave up hope of recovery. She said to Mrs. Bacigalupi: ''Don't leave me alone. . . . I am going to die.'' She died the next morning at twenty minutes to 7 o'clock. In the presence of Mrs. Gallo's approaching death no word was sent by any of the beneficiaries to either of the children, though John was in Stockton. Mrs. Gianelli testified that between 5 and 6 o'clock in the evening of the 26th Mrs. Bacigalupi ''came to my house and said that her sister was dying . . . and that she knew she was going to die. And I then asked her if she had notified the children; if John, or John Gallo knew. She

said no, that he didn't know it; that she didn't want him because he would send for the sister in the city, if he knew the mother was dying, and that they didn't want her." Mrs. Bacigalupi denied having made the statement, but on motion for a nonsuit Mrs. Gianelli's testimony was entitled to full credit. Mrs. Bacigalupi testified that she did not notify Esta of her mother's condition and explained: "I didn't know her address and I didn't send no message to her." She did not testify that she made any effort to learn Esta's address. It is apparent that she would have had no difficulty in ascertaining such address if she had endeavored to do so.

Mrs. Gianelli testified that Mrs. Gallo "seemed to be frightened about going to have an operation. . . . She thought she was going to die. . . . She was sick and very miserable, nervous, had headaches, and seemed as though she was sick all over. . . . She was . . . very, very sallow at that time. . . . She was sick in general, all over, especially her head. With reference to her head, she just said she had awful headaches. . . . She would lay down her glasses, or something, her purse or something . . . then she would have to look for it. She would then say: 'I think I am going crazy.' . . . The latter part of 1919 she used to say that she would get those periodical spells, she was at one time better, then again she would get worse with those pains that she had, and the gall-stones; and the doctor told her she would suffer headaches, and that seemed to be periodical. . . . She almost incessantly spoke of being ill." Eugene B. Podesta testified that after Mrs. Gallo returned from the hospital the second time she "said she almost died." Clarence A. Garrett testified that in 1918 Mrs. Gallo said "if she didn't get a change and the people would leave her alone, she was losing her mind. She couldn't remember nothing. She had to get away from them. I told her . . . to forget it, that she was a young woman yet; to get away from it. She said she couldn't, that it kept preying on her mind all the time. . . . She said the only trouble she ever had between her and her son was other people interfering. . . . I saw her crying or nervous more than once. . . . She said she was losing her mind on account of people preying on her." F. J. Green testified that "shortly before the first operation" Mrs. Gallo said that "the way she felt, she

was going to be pretty sick, liable to die. . . . She was worried about her money matters. Ever since her place was out of business, seemed to worry her.'' Mrs. Molini testified that two or three weeks before her death Mrs. Gallo said that ''somebody was talking about her children, and she told me that she didn't like anybody to talk about her children. If there was any talking to do, she would do that herself.'' John Gallo testified that when he visited her the evening of April 20th ''she talked fair. I says: 'Awful funny you come out to the hospital and don't let one know'; and she says: 'I told them to tell you.' I says: 'Who?' And she says: 'Lolly and Panini.' . . . Lolly is her brother, my uncle, Peter Foppiano. . . . Peter Foppiano or Mr. Panini had not given me any information that she was ill or at the hospital, no time. When I told her they had not let me know, she says: 'Kind of funny; I told them.' I says: 'Maybe they didn't want me to know; maybe they got things fixed up to suit themselves.' . . . She said: 'If I get better this time, nobody will get my money. I am going to have my dear friends—' I says: 'There is no one looking for your money that I know of, unless it is your dear friends.' And she says: 'Well, I think so too.' . . . She said she had pains, the pains were choking her, suffocating her. She was kind of throwing herself back. . . . The next day she said they didn't feed her much. . . . She complained about not getting enough to eat. And I saw a tray setting there. She didn't eat but part of what was on the tray.'' He said that when Panini was present in his mother's home she ''just looked to be so scared and nervous, shaking like.'' Mrs. Eberhardt testified that she observed Mrs. Gallo's manner during the years 1919 and 1920 and that ''at times I really thought that she sometimes did not really know what she was talking about. . . . At times I thought she used to act very excitable''; that before the first operation ''she made the remark that she was bothered.'' Of the many witnesses examined by contestants, none expressed an opinion as to the mental sanity of decedent. Mrs. Bacigalupi testified that her sister was of sound mind. She admitted that once or twice before Esta's marriage she referred to Esta, in Mrs. Gallo's presence, as the ''queen'' and said ''she had a good home and didn't appreciate it.'' John Gallo testified: ''I first learned that my mother had

made a will the morning she died, about ten minutes after
having taken her out of the house. Mrs. Bacigalupi, Pete
Foppiano, and Panini were present and there was some
other gentlemen. . . . They were talking together. Mrs.
Bacigalupi said the will was made, if the 'queen' knew what
she was going to get, she couldn't buy very much with it.''
Mrs. Bacigalupi testified that she did not make such state-
ment, and that ''my first information that my sister had
left a will came when I seen it in the paper.'' She and
Panini both testified that they never talked with Mrs. Gallo
about making a will or suggested to her the manner in which
she should dispose of her property. From the evidence as a
whole it may fairly be inferred that Mrs. Gallo was unable
to read or write, except that she was able to write her name.
The will declares that the testatrix thereby revokes and an-
nuls ''all former wills and codicils by me made.'' Other
than this provision of the will the evidence is silent as to
whether she had made a prior will. Her declarations, made
prior to April 19th, to the effect that she had made a will,
of course, are not competent evidence of the fact so stated.
Mr. Ashley, attorney for contestants, was attorney for Mrs.
Gallo in her suit against her son. Both before and after
April 19th, she stated that her will was in his possession.
Her apparent confidence thus manifested in the attorney
who had successfully conducted her litigation in the past
suggests the query whether the selection of another attorney
to draw her will was her own act. These facts are entitled
to consideration, in connection with other circumstances, in
determining the issue of undue influence.

[1] The rules governing the dispositions of motions for
nonsuits are well settled. ''In determining whether or not
in a proceeding to contest a will, the evidence produced by
the contestants is sufficient to require the submission of the
case to the jury the same rules apply as in civil cases. Every
favorable inference fairly deducible and every favorable
presumption fairly arising from the evidence produced must
be considered as facts proved in favor of the contestants.
Where evidence is fairly susceptible of two constructions, or
if either of several inferences may reasonably be made, the
court must take the view most favorable to the contestants.
All the evidence in favor of the contestants must be taken as
true, and if contradictory evidence has been given it must

be disregarded. If there is any substantial evidence tending to prove in favor of the contestants all the facts necessary to make out their case, they are entitled to have the case go to the jury for a verdict on the merits.'' (*Estate of Arnold,* 147 Cal. 583, 586 [82 Pac. 252]; *Estate of Ricks,* 160 Cal. 450 [117 Pac. 532]; *In re Ross,* 173 Cal. 178 [159 Pac. 603]; *Estate of Campbell,* 46 Cal. App. 612 [189 Pac. 812].) Applying the foregoing rules, it sufficiently appears from the evidence: (1) That at the time Mrs. Gallo presumably gave directions for the preparation of the will and at the time she signed it she was troubled in mind, weakened in body and suffering greatly from a serious illness; (2) that the will is very unnatural and unjust; (3) that Panini selected the attorney who drew the will, knowing that such attorney was not the one who had theretofore attended to Mrs. Gallo's legal affairs; (4) that Mrs. Bacigalupi, charged with undue influence, entertained a settled dislike for Esta; (5) that the testatrix was surrounded exclusively by those who benefit by the terms of the will; (6) that the beneficiaries thereunder designedly refrained from notifying the son and daughter of their mother's dangerous illness, at times when the presence of the children would naturally have tended to frustrate any purpose the beneficiaries may have had to influence the testatrix in the disposition of her property. The evidence must be weighed in the light of the fact that the circumstances surrounding the immediate execution of the will were within the exclusive knowledge of those interested in upholding it while the opportunity of acquiring such knowledge was withheld from contestants. The latter were under the necessity of calling the defendants as witnesess to prove the circumstances attending the execution of the instrument. The unfortunate situation of contestants cannot dispense with proof of their case, but ''evidence is to be estimated not only by its own intrinsic weight, but also according to the evidence which it is in the power of one side to produce and of the other to contradict.'' (Code Civ. Proc., sec. 2061.)

[2] The law is settled beyond controversy in this state that a will cannot be set aside on the mere ground that it is unjust or unnatural. (*Estate of Wall,* 187 Cal. 50 [200 Pac. 929]; *Estate of Baird,* 176 Cal. 381 [168 Pac. 561]; *Estate of Martin,* 170 Cal. 657 [151 Pac. 138]; *Estate of*

*Lavinburg*, 161 Cal. 536 [119 Pac. 915].) **[3]** Such facts, however, have weight in determining whether a testator was mentally competent at the time of executing a will (*Estate of Martin*, 170 Cal. 657 [151 Pac. 138]; *In re Wilson*, 117 Cal. 262 [49 Pac. 172, 711]; *Field* v. *Shorb*, 99 Cal. 661 [34 Pac. 504]), or was acting under undue influence. (*Estate of Snowball*, 157 Cal. 301 [107 Pac. 598].) The weight to be given such evidence depends upon how far the provisions of the will depart from what would be natural. As bearing upon the importance which courts have given to unnatural provisions in wills, it may be noted that in some states, where a testator has left his property to strangers in blood, to the exclusion of his wife or children with whom he had lived on apparently friendly terms, evidence of such facts has been held sufficient to shift the burden of proof and to require the proponents of the will to show "that it was the free and deliberate offspring of a rational, self-poised, and clearly disposing mind." (1 Redfield on Wills, p. 537; Schouler on Wills, Executors and Administrators, 5th ed., sec. 77; *Mullen* v. *McKeon*, 25 R. I. 305 [55 Atl. 747]; *Lancaster* v. *Alden*, 26 R. I. 170 [58 Atl. 638]; *Gay* v. *Gillilan*, 92 Mo. 251 [1 Am. St. Rep. 712, 5 S. W. 7]; *Weston* v. *Hanson*, 212 Mo. 248 [111 S. W. 44]; *Harrel & Co.* v. *Harrel*, 62 Ky. (1 Duv.) 203; *Johnson* v. *Shaver*, 41 S. D. 585 [172 N. W. 676].)

**[4]** The mere existence of a confidential relation between a testator and one who unduly profits by the will is not sufficient to overturn it, but when such beneficiary "has actually participated in procuring the execution of the will, the burden is on him to show that the will was not induced by coercion or fraud." (*Estate of Baird*, 176 Cal. 381, 384 [168 Pac. 561]; *Estate of Ricks*, 160 Cal. 450 [117 Pac. 532]; *Estate of Lavinburg*, 161 Cal. 536 [119 Pac. 915]; *Estate of Packer*, 164 Cal. 525 [129 Pac. 778].) **[5]** The fact that the will attempts to dispose of the piano which belonged to Mrs. Galbraith, whose ownership Mrs. Gallo knew and recognized, is entitled to some consideration, however slight, as tending to show that the will was the product of a mind other than her own. "Such fact would make the will more unnatural, and, although it would not prove undue influence, it would be a proper circumstance to be considered in connection with other facts tending to prove such influence."

(*In re Ruffino,* 116 Cal. 304, 317 [48 Pac. 127, 130].)
[6]  The circumstances attending the execution of a will
by a testator who is dangerously ill and expecting to die, at
a time when he is surrounded exclusively by those who
benefit by it, are subject to close scrutiny.  (*Goble* v. *Grant,*
3 N. J. Eq. 629; *In re Knight's Will,* 87 Misc. Rep. 577 [150
N. Y. Supp. 137].)  In addition to the foregoing, the suc-
cessful efforts of the beneficiaries to keep the son and
daughter out of their mother's presence at times vital to
the defendant's purpose, as alleged in the petition, are en-
titled to weight.  [7]  In building up a case on circum-
stantial evidence, it is not necessary that any single fact
proved, standing alone, shall establish the issue, but it is
sufficient if all the facts and circumstances given in evi-
dence, considered together, lead to a rational inference that
the ultimate fact is as alleged.  [8]  Of course, it is not
intended to intimate that the weight of the evidence is on
the side of one party or the other, but it is held that there
was sufficient evidence to go to the jury on the issue of
undue influence.

Many rulings of the court in the admission and rejection
of evidence are assigned as errors.  In several instances the
testimony ruled out was later admitted.  Of the more than
three hundred exceptions noted a comparatively small num-
ber have merit.  In view of the fact that contestants were
compelled to make out their case on circumstantial evidence,
together with the testimony of defendants, they were en-
titled to as great latitude as the rules of evidence will per-
mit.  [9]  Panini testified that he was born in Italy De-
cember 26, 1875.  The court struck out this testimony as
immaterial.  Since Panini was charged with undue influ-
ence, in determining the probability of such having been
exercised and the probable effect thereof upon Mrs. Gallo,
the nationality of both and their relative ages were material.
[10]  Without considering all of appellants' contentions
specifically, it may be said generally that contestants had the
right to show that the property of decedent had been ac-
cumulated in part by the efforts of the son, because such
evidence would tend to prove that the will was the more un-
natural (*In re Wilson,* 117 Cal. 262, 280 [49 Pac. 172,
711]);  [11]  that the children owned little or no prop-
erty, because it would be more unnatural for a parent to

disinherit a son or daughter having limited means of support than one who was in affluent circumstances; that any of the beneficiaries had attempted to prejudice the testator's mind against either contestant; [12] that such beneficiaries, having Mrs. Gallo in their charge at times of her dangerous illnesses, did not notify the son and daughter thereof. While Louis Bacigalupi was on the witness-stand he was asked whether, on the nineteenth day of April, 1920, his wife, Rose Bacigalupi, said to him: "You hurry up and go and make Annie's will. She wants to make a will." The court sustained defendants' objection to the question on the ground that no foundation had been laid, in that Mrs. Bacigalupi had not been asked while on the stand whether she had made such statement. The court seems inadvertently to have overlooked the fact that the question was not asked for purposes of impeachment, but to show the activity of Mrs. Bacigalupi in trying to procure the execution of a will by decedent. Such activity would be a circumstance to be considered on the issue of undue influence.

[13] While the declarations of the testatrix were admissible to show her feelings and desires with respect to her children and as bearing upon her state of mind, the conclusion that there was sufficient evidence to go to the jury on the issue of undue influence is not based upon the assumption that such declarations as to any past event are competent proof of such event.

The judgment is reversed.

Hart, J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 26, 1923.