[L. A. No. 233. Department Two.—June 16, 1897.]

IN THE MATTER OF THE ESTATE OF BRIDGET WILSON, DECEASED. JOHN WILSON ET AL., RESPONDENTS, v. JOHN McCONNACHIE ET AL., APPELLANTS.

CONTEST OF WILL—AMENDMENTS AFTER LAPSE OF YEAR—FRAUD AS NEW GROUND OF CONTEST—UNDUE INFLUENCE—AMPLIFICATION OF CHARGES. Upon a contest of a will instituted after its admission to probate, the grounds of contest cannot be amended after the lapse of the year limited for the institution of the contest so as to add fraud as a new ground of contest, or new cause of action; but amendments which are in mere amplification or more definite statement of charges of undue influence originally made, may be allowed after the expiration of the year.

ID.—UNDUE INFLUENCE—FINDING AGAINST EVIDENCE.—Where there is no evidence to show influence over the testamentary act such as would amount to physical or moral coercion, or destroy the free agency of the testator as to such act, a finding that undue influence was exercised will be set aside as contrary to the evidence.

ID.—RULE AS TO CONFLICTING EVIDENCE—PREJUDICE OF JURY—CUSTOM TO UPSET WILLS.—The rule as to conflicting evidence is the same in will contests as in other cases, and wherever there is a fair and reasonable amount of evidence to support the finding of the jury, it will not be disturbed upon appeal, though against the preponderance of the evidence, but where one side of an issue is fully established, and the jury find the other way upon no evidence that is substantially conflicting, or upon a mere pretense of such evidence, or upon evidence so slight as to manifest beyond doubt that the verdict was the result of passion or prejudice, its finding should not be allowed to stand, and where verdicts upsetting wills are reversed, it is only because in such cases the jury are wont to render verdicts upon insufficient evidence or upon mere suspicion when the testator has not disposed of his property in a manner which suits the views of the jury.

ID.—TESTAMENTARY RIGHT INCIDENT TO OWNERSHIP—JUDICIOUS USE NOT ESSENTIAL—DUTY OF COURTS.—The right to dispose of one's property by will is solemnly assured by law, and is a valuable incident to ownership, and does not depend upon its judicious use; nor can courts properly permit the prejudices of a jury to set aside a will merely upon suspicion, or because it does not conform to their ideas of what is just and proper.

ID.—MENTAL COMPETENCY OF TESTATOR—PRESUMPTION—BURDEN OF PROOF. The law presumes that every person possesses a sound and disposing mind, and the burden is upon the contestant to establish by a preponderance of evidence that the testator did not at the time of making the will possess a mind sufficiently clear and strong to be able to know and understand the nature of the testamentary act, to know and remember the character and extent of the property disposed of, and the manner in which and the persons to whom it is desired to distribute it.

ID.—PROOF OF TESTAMENTARY CAPACITY—INSUFFICIENT CONFLICT—HABIT OF INTOXICATION—PHYSICAL SUFFERING.—Where a clear case of the

testamentary capacity of the deceased at the very time of the execution of the will and codicil is made by numerous witnesses, and no witness testifies directly to the contrary, evidence that for many years prior to that date the deceased had frequently drank intoxicating liquors to ex= cess, and had become greatly intoxicated, is not sufficient to raise a sub- stantial conflict upon the subject of testamentary capacity, there being no pretense that the deceased was intoxicated at the time of the testa- mentary act, and it appearing that when not intoxicated, deceased, though illiterate, possessed ordinary intelligence and shrewdness such as an illiterate person may have to do business; nor is any conflict raised by proof that at the time of the execution of the instruments deceased was suffering from very distressing wounds caused by a burn from the effects of which death afterward resulted.

ID. — UNNATURALNESS OF WILL — PROOF OF TESTAMENTARY CAPACITY — EXPLANATION.—A will cannot be upset merely because in the opinion of the jury it is unnatural; and whether or not it is unnatural can only be considered when there is some evidence immediately tending to show mental incompetency, fraud, or undue influence, but the objection that the will is unnatural is not sufficient to overturn it, in the face of clear and plenary proof of full testamentary capacity at the time the will was executed, and must vanish in the presence of a reasonable explanation of the act and a clear intent to do it with a full knowledge of conditions and consequences.

ID. — EVIDENCE — MANNER OF ACQUISITION OF PROPERTY BEQUEATHED. The contestants of the will may introduce evidence of the manner in which the deceased acquired the property disposed of in the will, as bearing in some degree, however remotely, on the question of testa- mentary capacity.

ID.—SEPARATE CONTESTS — ORDER FOR SINGLE TRIAL — APPEAL BY PRO- PONENTS OF WILL.—Where separate contests of a will were ordered to be tried together, upon an appeal taken by the proponents of the will, they cannot justly object to such order, and the question whether the contestants could have rightfully demanded separate trials does not arise.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order denying a new trial. W. H. CLARK, Judge.

The facts are stated in the opinion of the court.

*A. M. Stephens, Smith & Winder,* and *Anderson & An- derson,* for Appellants.

There was no sufficient evidence of undue influence, and the case presents another example of the tendency of juries to substitute their own views of what is right and proper for those of testators. (*In re McDevitt,* 95 Cal. 33; *Estate of Carpenter,* 94 Cal. 406; *Estate of Car-*

*riger,* 104 Cal. 81; *Estate of Langford,* 108 Cal. 608.)
The court could not allow a new ground of contest after
the lapse of the year. (Code Civ. Proc., sec. 1327; 13
Am. & Eng. Ency. of Law, 689.) There is no evidence
to support the finding of mental incapacity; but the
proof is to the contrary. A drunkard is not necessarily
of unsound mind. (*Estate of Lang,* 65 Cal. 20.)

*John S. Chapman, George J. Denis,* and *White & Mon-
roe,* for Respondents.

The questions as to undue influence and mental inca-
pacity were for the jury, who alone are to determine
the credibility of the witnesses, and who may reject the
most positive evidence, and decide upon circumstantial
evidence. (Code Civ. Proc., sec. 2061, subd. 2; *Wing
Chung* v. *Los Angeles,* 47 Cal. 531; *Baker* v. *Fireman's
Fund Ins. Co.,* 79 Cal. 34; *Quock Ting* v. *United States,*
140 U. S. 417; *Callison* v. *Smith,* 20 Kan. 28; *Kansas
etc. Ry. Co.* v. *Anderson,* 23 Kan. 44; *Kavanagh* v. *Wilson,*
70 N. Y. 177; *Taylor* v. *Randall,* 3 Colo. 401; *Durant* v.
*People,* 13 Mich. 351; *Koehler* v. *Adler,* 78 N. Y. 287;
*Wait* v. *M'Neil,* 7 Mass. 261; *Mogk* v. *Peterson,* 75 Cal.
501; *Bernal* v. *Wade,* 46 Cal. 663; *Crook* v. *Forsyth,* 30
Cal. 662; *McKeever* v. *Market Street R. R. Co.,* 59 Cal.
300; *People* v. *Murray,* 86 Cal. 31.) Injustice in a will
is evidence tending to show insanity and undue in-
fluence. (*Sim* v. *Russell,* 90 Iowa, 656; *Davis* v. *Cal-
vert,* 5 Gill & J. 269; 25 Am. Dec. 291; *Clark* v. *Fisher,*
1 Paige, 171; 19 Am. Dec. 406; *Patterson* v. *Patterson,*
6 Serg. & R. 55.) Drunkenness is evidence for the
jury upon the question of insanity. (*Estate of Gharky,*
57 Cal. 274; *Estate of Johnson,* 57 Cal. 530; *Duffield* v.
*Morris,* 2 Harr. (Del.) 375; Redfield on Wills, 213, 324,
345.) Undue influence or fraud may be proved circum-
stantially. (*Reynolds* v. *Root,* 62 Barb. 250; *Sanders'
Appeal,* 54 Conn. 108; *Muir* v. *Miller,* 82 Iowa, 700;
*Tyler* v. *Gardiner,* 35 N. Y. 583–88.)

McFARLAND, J.—This is an appeal by the proponents

of the will of Bridget Wilson, deceased, which was pro-
bated on May 9, 1893, from a judgment vacating the
probate and from an order denying proponent's motion
for a new trial.

The said Bridget Wilson died on the fourteenth day
of March, 1893, at Los Angeles, California. She left a
will, dated February 27, 1893, and executed on that
day, and a codicil to said will, executed and dated on
the 11th of March, 1893. These two instruments were
admitted to probate as constituting the last will and
testament of the deceased. She left no children or
lineal descendants, and her husband, John Wilson, was
her only legal heir. By the instrument of February
27th (which, for convenience, we will call the *will*, to dis-
tinguish it from the codicil), after making bequests and
devises to several different parties, and, among others,
one thousand dollars to Charles McMahon, she left the
residue of her estate to Alicia McMahon, who is the
mother of said Charles McMahon. She also in this
will gave to her husband fifty dollars per month. By
the codicil she revoked the gifts to both said Charles
and Alicia McMahon, and left the greater part of her
estate undisposed of, so that it would go to her husband
as her legal heir.

On the last day of the year succeeding the probate of
said instruments as the will of the deceased, the said
John Wilson filed a written contest of the same, in
which he averred that for various alleged reasons the
will had not been properly executed. He further alleged
that at the time of the execution of both the will and
the codicil the deceased was not of sound mind or com-
petent to make a will; and also that the will and codicil
were procured by the undue influence of one John Mc-
Connachie, the undue influence alleged being that the
said McConnachie was the agent of the deceased and
possessed great power and influence ever her, and "was
continually poisoning the mind of said Bridget Wilson
against the contestant herein, the said John Wilson,
her husband, by reporting to her false and scandalous

reports concerning the conduct of the said John Wilson"; and that by means of said false reports, while she was physically and mentally weak and suffering great pain, he induced her to change her will and leave property of great value to him. The attack of the contestant Wilson was against both the will and the codicil. On the same day the said Alicia McMahon and Charles McMahon also filed a contest directed against the codicil alone, averring that the deceased at the time of making said codicil "was not of sound and disposing mind, but was, on the contrary, of unsound mind and insane, and mentally incompetent to make a will"; and that the codicil was procured to be made by the undue influence and fraud of the said McConnachie and Michael Curran and his wife, Mary Curran, who, it is alleged, falsely represented to the deceased that the McMahons had no love or affection for her, and that they were exceedingly wealthy, and in no need of any gifts from her, and thus poisoned the mind of the deceased against them and induced her to revoke the said gifts to them. They also allege that McConnachie and the Currans prevented friends of the deceased from seeing her, etc. It thus appears that the contest of John Wilson goes upon the theory that the deceased was of unsound mind and incompetent to make a will, and was improperly influenced at the time this will was made and also at the time the codicil was made, while the theory of the McMahons is that she was competent to make a will and was free from any undue influence on the 27th of February, but was incompetent and improperly influenced twelve days afterward, when the codicil was made. To complicate the matter further Wilson filed an answer to the written contest of the McMahons, in which he denied all its allegations. Afterward Wilson was allowed, over the objections of the proponent, to file an amendment to his contest, in which he sets up the facts which he claims to have constituted undue influence, by averring substantially that McConnachie falsely poisoned the mind of the deceased

with stories about her husband being too intimate with
a woman by the name of Sanchez, and also that de-
ceased was unduly influenced by Michael and Mary
Curran, the averment being substantially that McCon-
nachie and the Currans prevented the friends of John
Wilson from seeing the deceased, and made false repre-
sentations to her about the conduct of John Wilson
and the said Sanchez.

The jury returned a special verdict in answer to
eleven interrogatories proposed to them. In answer to
all the interrogatories touching the signing of the will
and codicil, their proper attestation, publication, and
execution, the verdict was in favor of proponents.
They found also that at the date of the execution of both
the will and the codicil the deceased was not of sound
mind. The interrogatory as to undue influence was as
follows: "Was the execution of said instrument of date
February 27, 1893, procured through the undue influence
of John McConnachie, Michael Curran and Mary Curran,
or either of them?" and the answer was "Yes." The
interrogatory as to the codicil was in the same form,
and the answer was the same. The interrogatory as to
whether the instruments were procured through fraud,
was also in the same form, and the answers were the
same; that is to say—was the instrument " procured
through the fraud of John McConnachie, Michael Cur-
ran and Mary Curran, or either of them?" and the an-
swer was "Yes."

Appellants took a great many exceptions to rulings
of the court, which are elaborately argued by the re-
spective counsel; but, under our views of the case, it is
not necessary to notice all, or, indeed, the greater part
of these exceptions. Such as are necessary to be con-
sidered, we will notice hereafter. We may say here,
however, that the part of the amendments to the Wilson
written contest which set up fraud should have been
stricken out, because the amendments were made more
than a year after the probate of the will, and, as the
alleged fraud was a new cause of action, it could not be

set up for the first time after the expiration of the year. Appellants also contend that the court erred in allowing the Wilson amendments made after the year on the subject of undue influence. In the original, undue influence was charged against McConnachie, which was averred to consist in "reporting to her false, scandalous reports concerning the conduct of the said John Wilson"; but the nature of the reports was not stated, and in the amendments it was stated what those reports were, and also that undue influence was exercised by Michael and Mary Curran. The point of appellants is, that these amendments state new matters which could not be set up after the expiration of the year. This contention of appellants cannot be maintained as to the amendments about the alleged undue influence of McConnachie; it was a mere amplification of the original charge, and may properly be considered as simply a more definite statement of what had been formerly averred. But the point must be sustained as to the averment in the amendment about the undue influence alleged to have been exercised by Michael and Mary Curran; these averments are not amendatory or explanatory, or in amplification of anything alleged in the original, but are statements of entirely new matters, constituting another and independent cause of contest, which could have been presented only within a year after the probate. Therefore, the demurrer to these should have been sustained, or they should have been stricken out or disregarded. And, for this reason, the answer of the jury, "Yes," to the various interrogatories asking whether the will or codicil was procured through the undue influence of McConnachie, Michael Curran, and Mary Curran, "or either of them," has no significance. It is not a finding that it was procured through the undue influence of McConnachie; and the question of the undue influence of the Currans was not properly before the jury. As to the undue influence alleged in the contest of the McMahons, there is no pretense that there was any proof of it; and there was none. And if

it were allowable to consider the answers of the jury to
the interrogatories submitted to them by the court as
findings that the will and codicil were procured through
the undue influence of *McConnachie,* we are satisfied that
under the decisions of this court in former cases, and
particularly in *Goodwin* v. *Goodwin,* 59 Cal. 560, *Estate of
Carpenter,* 94 Cal. 406, *In re McDevitt,* 95 Cal. 33, *Estate
of Carriger,* 104 Cal. 81, and *Estate of Langford,* 108 Cal.
608, the evidence was clearly insufficient to support
such finding, or any finding of undue influence by any
person.

The real question in the case is whether or not there
was evidence sufficient to justify the findings that at the
time of the execution of the will and the codicil the de-
ceased was not mentally competent to make a will; and
we are satisfied that the question should be answered in
the negative.

Counsel for respondents say very properly that the
rule as to conflicting evidence is the same in will con-
tests as in other cases; and they seem to intimate that
the rule has not been applied in some former probate
cases, and to indicate a fear that it may not be applied
in the case at bar. Of course, the rule is the same in
all cases. Wherever there is a fair and reasonable
amount of evidence to support the finding of a jury, it
will not be disturbed here, though in our opinion it is
against the preponderance of evidence; but where one
side of an issue is clearly, amply, and firmly established
by an unbroken line of evidence, and the jury find the
other way upon no evidence that is " really and substan-
tially conflicting," or upon a mere pretense of such evi-
dence, or upon evidence so slight as to leave no room to
doubt that the verdict was the result of passion or pre-
judice—there the finding should not be allowed to
stand. This has always been the rule. And if it has
happened here that quite a number of verdicts upsetting
wills have been reversed, it was not because the rule
as to conflicting evidence had not been properly ap-
plied, but because in will contests more than in any

other class of cases are juries wont to render verdicts upon insufficient evidence. The history of this species of litigation shows that quite a number of people have come to think that the right to dispose of property by will has but little significance, and may be legally disregarded whenever the testator has not disposed of his property in a manner which suits the views of a jury. "But the right to dispose of one's property by will is most solemnly assured by law, and is a most valuable incident to ownership, and does not depend upon its judicious use. The beneficiaries of a will are as much entitled to protection as any other property owners; and courts abdicate their functions when they permit the prejudices of a jury to set aside a will merely upon suspicion, or because it does not conform to their ideas of what was just and proper." (*In re McDevitt*, *supra*.)

With respect to the mental competency of the deceased at the date of the will and at the date of the codicil, the court, among other things, correctly instructed the jury as follows: "Upon these two issues I instruct you that the burden of proof rests with the contestant, John Wilson. The law presumes that every person possesses a sound and disposing mind, and it is incumbent upon the contestant to establish by a preponderance of the evidence that Bridget Wilson did not, on February 27, 1893, or on March 11, 1893, possess a mind sufficiently clear and strong to enable her to know and understand the nature of the act in which she was then engaged, to know and recollect those who were the natural objects of her bounty, to know and remember the character and extent of her property, the manner in which and the persons to whom she wished it distributed; and if he has failed to show that such was the condition of the mind of the deceased on February 27, 1893, your answer to interrogatory number 1 should be 'Yes'; and if he has failed to show such to have been the condition of her mind on March 11, 1893, your answer to interrogatory number 2 should be 'Yes.'"

Now the evidence introduced by appellants showed clearly and fully that on the two occasions referred to the deceased did " possess a mind sufficiently clear and strong," within the meaning of said instruction, to make a valid will; it leaves no doubt on that subject. The witnesses to the will were Mr. Winder, the lawyer who wrote it at her dictation, and who had been one of her legal advisers for a long time, Mr. Hannon, who was then a clerk in Winder's office, and Dr. Boyd, who was one of the physicians attending the deceased. The witnesses to the codicil were the said Winder and Boyd, and a gentleman named Wiskotschill. All these attesting witnesses were examined at the trial, and their testimony was clearly and fully to the point that when the will and codicil were executed the deceased was in full possession of her mental faculties, knew what she was doing, and was perfectly competent to do it. There were three physicians who attended the deceased during her last illness—Dr. Worthington, who had attended her on several former occasions, Dr. Boyd, who was called upon immediately after the accident which caused her illness and subsequently her death, and attended her during nearly the whole period of her illness, and Dr. Lasher, who was in attendance for several days before her death. Appellants put all these physicians on the stand as witnesses; but on the objections of respondents, based on subdivision 4 of section 1881 of the Code of Civil Procedure, the offered testimony of Worthington and Lasher was excluded. Dr. Boyd, being an attesting witness, was allowed to testify, and his testimony was fully to the point of the competency of the deceased. He said: " At the time the will was executed and also when the codicil was executed her mind was perfectly clear. At either of those times I had noticed nothing at all to indicate any failure of mind in any way. My opinion is that her mind was perfect, both at the time of the execution of the will and of the codicil. On the day after the codicil was written her mind was perfectly clear." Dr. Worthington was afterward recalled by appellants for the pur-

pose of proving a conversation which he had with deceased about a certain child who was a beneficiary in the will, and also for the purpose of trying to show that he had formed an opinion of her mental soundness from matters not of a professional and confidential nature; and it clearly appeared, from testimony that was admitted, that he considered her of sound mind. In the course of his examination counsel for respondents asked him this question: "Well, doctor, in treating patients such as Mrs. Wilson was, is it not necessary, and is it not your habit, in prescribing for her, to ask her something in connection with the condition of her mind?" To which he replied: "Well, in this case, it *never occurred to me.*" He was then asked by counsel for respondents: "Well, I say, isn't it necessary?" To which he replied: "Well, if there was any—if there was *any doubt about her mind at all,* then I should; but in this case I didn't think so. Therefore I didn't, you know, pay any particular attention at all. She was *perfectly clear,* of course, in every way, and I therefore ——" Q. "Well, that isn't, I think, in response to my question." What he afterward said on the subject of her mental condition we will not allude to, because it seems, although it does not clearly appear, that it was stricken out. In addition to the testimony of the physicians and the attesting witnesses, a large number of persons who were intimate acquaintances of the deceased who saw her during her last illness, about the time of and before and after the dates of the execution of the will and codicil, testified to her mental soundness; and the testimony of these witnesses need not be detailed here or commented on, because no witness of respondents tes-- tified to the contrary, although many of their witnesses were intimate acquaintances of the deceased and visited her during her last illness. In addition to the opinions of appellants' witnesses that her mind was sound, conversations and acts of the deceased about the time of the execution of the will and codicil were testified to, by various witnesses, which showed mental capacity and

her ability "to know and understand the nature of the act in which she was then engaged, to know and recollect those who were the natural objects of her bounty, to know and remember the character and extent of her property, the manner in which, and the persons to whom, she wished it distributed." To the lawyer who drew the will and codicil she gave descriptions of her property, and named, with apparent accuracy, many persons and places in California and Ireland. Some of her acts especially showed a strong and determined will; for instance, she was much attached to a member of the firm of lawyers who had done her legal business for many years, and desired to make a bequest to him, which he declined; but, when he requested her to bequeath a certain amount to the public library of the city of Los Angeles, she peremptorily refused, because she thought that, in certain matters, the city had treated her very unjustly. There were many other incidents in proof which present cumulative evidence of her mental competency; and it is beyond doubt that the evidence touching her mental condition, at the times of the testamentary acts, clearly shows her testamentary capacity at those times.

A clear case of the testamentary capacity of the deceased *at the very time* of the execution of the will and codicil, having been made by the evidence of the appellants above noticed, the question is, Did the respondents introduce evidence so inconsistent and contradictory of that introduced by appellants as to protect the verdict of the jury by the shield of the doctrine of "conflicting evidence"? We think not.

In the first place, there is no contradiction of the direct testimony of the numerous witnesses who knew the deceased, and saw and conversed with her during her last illness, that, in their opinion, she was of sound mind. It is a remarkable circumstance that, although respondents examined about thirty witnesses, many of whom were intimate acquaintances of the deceased, none of them were asked by respondents if, in their

opinion, she was mentally competent, and none of them testified that she was not.

Looking through the evidence, it is apparent that respondents' claim that the deceased lacked testamentary capacity at the date of will and codicil rests almost entirely upon these two facts: 1. That, for many years prior to that date, she had been addicted to the intemperate use of intoxicating drinks; and, 2. That, at the time of the execution of said instruments, she was suffering from very distressing wounds on her person, caused by a burn, from the effects of which she afterward died.

There is no doubt that, under the evidence, it must. be taken as true that, at times, she drank to excess, and was sometimes greatly intoxicated. As to the extent to which her habit of drinking went, there is a marked conflict of testimony—it being much more excessive, according to respondents' witnesses, than as represented by witnesses of appellants. But the jury had the right to accept the testimony of respondents' witnesses on the point. That testimony, however, leaving out of view the contradictory testimony of appellants' witnesses, went no farther than this: That for many years the deceased used intoxicating liquors; that she frequently used them to excess; that she was sometimes drunk, when, like other people in that condition, she talked foolishly; but that, when not in that condition, she was, as one of respondents' witnesses said, "perfectly straight," and that, although an illiterate woman, being unable to read or write, she had ordinary intelligence and shrewdness, and capacity such as an illiterate person may have to do business. Mark Leonard, one of respondents' witnesses, and certainly not an unwilling one, after having testified to her intoxication on certain occasions, said: "She was sober enough to transact business *most of the time*, but I am only speaking of a few times." William Maxey, another witness for respondents, having testified that he saw her intoxicated on a certain occasion, said: "I used to see Mrs.

Wilson quite frequently. I have seen her at times when not under the influence of liquor. When I saw her at her house, I couldn't say that she was under the influence of liquor as far as I could see. I used to see her in town when she was not under the influence of liquor, and I have seen her at times when she was. I have seen her sober. She attended to her business personally—a great deal of it." Another witness for respondents, Mrs. Blewett, having testified that the deceased "drank pretty ofte i," said: "In the afternoon, generally, she seemed to be more inclined to the effects of it. I know in the forenoon *she was always right,* but in the afternoon I would often find her asleep. *Sometimes*, at such times as I would find her asleep, she would be under the influence of liquor." George J. Dalton, a witness for respondents, said: "I have seen her sometimes that I thought she was under the influence of liquor, or something else; and other times that she seemed to be perfectly straight." I. W. Hellman, a witness for respondents, testified that he had known her about twenty-five years, and had done business with her as her banker for a long time, and that she came very frequently to his bank. He further testified as follows: "She was generally sober when she came. Bridget Wilson, though an illiterate woman, was a very bright woman, and a woman of a good deal of business. She talked nicely. Was rather an attractive woman in some respects, in her way of talking." Other quotations of a similar character might be made, but the foregoing are sufficient to indicate the general nature of her drinking habit and the limitations put upon it by respondents' own witnesses.

Of course, it is possible for long continued excessive use of alcoholic stimulants to so permanently impair the intellectual faculties of the person indulging in it as to degrade him or her to the condition of imbecility, or mental incompetency to do any legal act. But the question, in a case like the one at bar, always is, not what *might* have been the mental condition of the tes-

tator at the time of the execution of the will, but what *was* that condition. While evidence of the condition of the testator's mind both before and after the date of the testamentary act is admissible, yet it is important only as it bears upon that condition at the very time of the execution of the will. It unfortunately is often the case that exceedingly bright and strong-minded people are addicted to the excessive use of alcoholic drinks, and are frequently intoxicated; and to hold that the wills of such persons, although shown to have been executed when they were in full possession of testamentary capacity, can be upset by a jury upon mere proof of such drinking habit, would be to carry the rule of "conflicting evidence" beyond all reasonable bonds. Upon the point of excessive drinking, see *Ayres* v. *Hill*, 2 Addams Ecc. 268; *Peck* v. *Carey*, 27 N. Y. 9; *Elkinton* v. *Brick*, 44 N. J. Eq. 154; *Andress* v. *Weller*, 3 N. J. Eq. 604; *Harmony Lodge's Appeal*, 127 Pa. St. 276; *Bannister* v. *Jackson*, 45 N. J. Eq. 702; *Wheeler* v. *Alderson*, 3 Hagg. 211; *Kahl* v. *Schober*, 35 N. J. Eq. 461—in which it is said that "it is familiar law that habits of drunkenness do not of themselves take away a man's capacity to make a will." Under the circumstances of the case at bar the testimony of respondents' witnesses as to the use of alcoholic liquors by the deceased is entirely insufficient to justify the finding of the jury that at the time of the execution of the will and codicil she was not of sound mind. And the evidence affords no pretense for contending that she was intoxicated at the times of the testamentary acts.

Neither does the fact that deceased, at the time of the testamentary acts, was suffering from the injury which afterward caused her death afford any sufficient ground for the finding that she was incompetent to make a will at the time the will and codicil were made. A couple of days before the execution of the will she was badly injured by a fire which occurred in her house while she was, beyond doubt, in a state of intoxication; and she afterward died from the effects of the wounds then re-

ceived. She was badly burned on her thighs, and almost her entire abdomen was blistered, and a spot on it about the size of a silver dollar was burned through the skin. It is possible that these wounds might have had the effect of destroying her testamentary capacity, but the question is, Did they have that effect? And the evidence abundantly shows that they did not. A multitude of wills could be conveniently set aside by juries who do not like their contents, and the beneficiaries left without any redress, if mere evidence that a will was made during the last illness of the testator, which might have rendered him incompetent, is a sufficient "conflict" with clear proof that he was competent at the time of the testamentary act to warrant a verdict against the validity of the will. Would mere evidence of old age, which might possibly have so impaired the mental faculties of a testator as to render him incompetent, be sufficient to justify a verdict upsetting his will in the face of clear proof that he was competent at the time of the testamentary act? (See *Carty* v. *Connelly*, 91 Cal. 15; and cases cited in note on pages 61, 62 of 1 Jarman on Wills, 6th ed.)

The other arguments in favor of upholding the verdict do not need much notice. It is said that the will was unnatural, because but little was left to the husband of the deceased. This is not the fact if we consider both the will and codicil which were probated together; but, as was said in the *Estate of Langford, supra,* "the consideration of the question whether or not a will is 'unnatural'—by which is meant, we suppose, different from what it might have been expected to have been—is of no importance except in a case where there is some evidence immediately tending to show mental incapacity, fraud, or undue influence; in which event it might serve to help out a weak case. . . . . A will cannot be upset *because*, in the opinion of a jury or court, it is unnatural." And in *In re McDevitt, supra,* Temple, C., speaking for the court, said: "Although I do not think it of special interest here, it is well to remember that

one has the right to make an unjust will, an unreasonable will, or even a cruel will." However, if a man who had always lived in apparently the most affectionate relations with his family should leave a will in which all his property was given to strangers, and no reason could be suggested or explanation made why he thus disinherited those near relatives whom he had always seemed to love—this circumstance would certainly *tend* to show some delusion or alienation of reason at the time of the testamentary act. But it would not be sufficient to overturn the will in the face of clear and plenary proof of full testamentary capacity at the time the will was executed; and it would vanish in the presence of a reasonable explanation of the act and a clear intent to do it with a full present knowledge of conditions and consequences. In the case at bar the facts are such as to put it beyond the reach of the rule that under certain circumstances importance should attach to the consideration that a will was unnatural. Here the deceased and her husband had been for a long time on unfriendly terms. They had frequent quarrels; and she was highly incensed against him for what she believed to be improper relations between him and another woman. When the will was being drafted she said that fifty dollars per month was enough for her husband, and that if he got any more " he would only spend it on Eliza Sanchez," and that "he had told her that he would marry Eliza Sanchez before she was cold in the ground." Here, then, the fact that she did not give her husband more is fully and reasonably explained, and affords *no evidence of testamentary incapacity;* and the case presents no just reasons for a finding that the will was invalid because " unnatural."

Some contention is made that the contents of the will and codicil, considered in connection with two former wills, show mental incapacity. We see nothing in this contention. The deceased had made two former wills which she had canceled; and the worst that can be said about the contents of those wills is that she a

number of times changed some of the beneficiaries
and particularly her residuary legatees. We see noth-
ing extraordinary in this. It certainly affords no evi-
dence of testamentary incapacity. A steady purpose
to cut off her husband with a small monthly allowance
runs through all these wills, except the codicil in con-
test. That being her fixed purpose, and having a large
estate and no other near relatives, it is not at all strange
that she changed her mind as to whom the great resi-
due of her property, remaining after certain legacies,
should go. But during her last sickness, and after she
had made the will of February 27th, her husband fre-
quently went to see her, and they were often together
alone; and it was quite natural that under these circum-
stances, her animosity to him should soften, as it evi-
dently did. So with full knowledge of the consequences
of the provisions of the codicil, which were explained
to her by the lawyer who drafted it, although she ap-
parently had such knowledge before the explanation,
she by that instrument disposed of only a part of her
estate, and knowingly left the greater part to go to her
husband by operation of law.

There are no other suggestions made in the interest
of respondents which we deem it necessary to notice.
Looking through the entire record we are forced to the
conclusion that there is not sufficient evidence to sup-
port the verdict; and that the case presents another
instance of a jury being, insensibly perhaps, carried
away from the real issues legitimately before them by
the notion that the will was not such as in their opin-
ion it ought to have been, and, therefore, should be set
aside.

There are one or two other points made by appellants
which, perhaps, need notice.

We do not think that the court committed any error
of which appellants can complain by ordering the con-
tests to be tried together. They were proponents of the
will and codicil, and bound to maintain them against
all attacks; and if the contestants were willing to pro-

ceed together, there were no just grounds upon which appellants could object. Whether or not the contestants could have rightfully demanded separate trials is a question not before us.

The court did not err in allowing respondents to introduce evidence of the manner in which the deceased acquired property disposed of in the will. It bore in some degree, however remotely, on the question of testamentary capacity. (*Estate of Ruffino,* 116 Cal. 304.)

The instructions of the court as to the general propositions of law applicable to the case were clear and correct; and the contention that there was no evidence at all to warrant some parts of the charge can hardly be maintained.

We do not think it necessary to notice the numerous exceptions to rulings of the court as to the admissibility of various items of evidence, as the questions may not again arise; and there are no other matters which demand further discussion.

The judgment and order appealed from are reversed.

TEMPLE, J., concurred.

HENSHAW, J., concurring.—I concur in the foregoing judgment. I also concur in the opinion of Mr. Justice McFarland, saving that I think the amendments to the charge of undue influence whereby such influence is alleged to have been exercised by Michael and Mary Curran did not add a new ground of contest. But, as the opinion points out, the evidence fails to sustain the charge of undue influence against any of the persons named.

A petition for a hearing in Bank having been filed, the following opinion was rendered thereon on the sixteenth day of July, 1897, and the petition was denied.

THE COURT.—The opinion heretofore rendered is modified by striking out that part thereof which declares

that the amendment to the written contest which charges undue influence on the part of Michael and Mary Curran was improperly allowed. On further consideration we are of the opinion that the amendment may be considered as only an amplification of the original charge on that subject. This modification, however, does not affect the judgment of reversal, for, as stated in the opinion, there was no sufficient evidence to support "any finding of undue influence by any person."

Hearing in Bank denied.