[S. F. No. 7013. Department Two.—August 3, 1915.]

In the Matter of the Estate of MICHAEL MARTIN, Deceased; ELLEN TAYLOR et al., Contestants and Respondents, v. SAVINGS UNION BANK AND TRUST COMPANY (a Corporation), Proponent and Appellant.

WILL—CONTEST OF PROBATE—MENTAL INCAPACITY—SUFFICIENCY OF EVIDENCE.—In this contest of the probate of a will the verdict of the jury that the testator was of unsound mind is held supported by the evidence that he was primarily the victim of a monomania, evidenced by his intense, unwarranted, and unexplained hatred of his wife, which not only influenced and colored all his life, but was actively present and operative in the testamentary act; that in addition, his mental trouble progressed from the stage of monomania until it assumed the form of a general insanity, aided by the decay of his physical and mental powers due to advancing years.

ID.—DIRECT EVIDENCE OF MENTAL CAPACITY—CONCLUSIVENESS.—Direct and uncontradicted testimony that at the time of the execution of his will the testator was of sound and disposing mind, is not conclusive upon the question of his then mental condition.

ID.—DISINHERISON OF TESTATOR'S FAMILY—EVIDENCE OF MENTAL CONDITION.—The fact that a testator wills all or most of his property away from his wife and children with whom he has lived on apparently friendly terms may be considered in determining his mental condition.

ID.—TRIAL OF CONTEST—DEPOSITIONS—FAILURE TO RULE ON EVIDENCE PRIOR TO READING ANSWERS BEFORE JURY.—Where such contest was tried before a jury, on the single issue of the testator's mental unsoundness, and the evidence was sharply conflicting, it was prejudicial error, in receiving in evidence the depositions of witnesses that were taken without limitation either as to the questions asked or the answers given, to refuse to rule upon the admissibility of the testimony until the answers were actually read before the jury, if

CLXX Cal.—42

such answers, in many instances, were not only immaterial and irrelevant, but highly improper and injurious.

ID.—INTIMATE ACQUAINTANCES—OPINION AS TO MENTAL CONDITION—OPINION BASED ON HYPOTHETICAL QUESTIONS.—Intimate acquaintances, by virtue of the existence of such intimacy, are permitted to testify and to give their opinion upon the question of the sanity or insanity of the deceased, and the weight of this opinion evidence in each instance depends upon the facts forming the basis of it. Upon other matters their opinion evidence is of no legal value and is inadmissible and cannot be given in reply to merely hypothetical questions.

ID.—IMPROPER CROSS-EXAMINATIONS—QUESTIONS TENDING TO CREATE HOSTILE ATMOSPHERE BEFORE JURY.—On such a contest, it was error to allow the contestant, either on the direct examination of his own witness or on the cross-examination of the witnesses of the proponent, to question them with ceaseless reiteration concerning endless matters about which they had denied any knowledge, where it appears that the purpose of such method of examination was not to elicit any facts, but to make weight, to create an atmosphere before the jury.

ID.—HOSTILITY OF WITNESS—CAUSES OF CANNOT BE INQUIRED INTO.—While on the cross-examination of a witness it is competent to prove the fact of his enmity or unfriendliness to the party against whom he testifies, the cause of the witness' feelings is not a proper subject of inquiry.

ID.—INSTRUCTIONS—SINGLING OUT ISOLATED FACTS.—On such contest, where the sole issue was the soundness or unsoundness of the mind of the testator, and its effect upon his testamentary act, it was erroneous for the court, in its instructions, to single out and bring into prominence before the jury certain isolated facts, thereby, in effect, intimating to the jury that special consideration should be given to those facts.

ID.—ABANDONMENT OF CERTAIN GROUNDS OF ORIGINAL CONTEST.—Where the contestant included within the grounds of the original contest charges in addition to that of the mental incapacity of the testator, but abandoned such additional grounds at the trial, it was error for the court to refuse to instruct the jury that such grounds of contest had been abandoned.

ID.—VALIDITY OF PROVISIONS OF WILL NOT INVOLVED ON CONTEST.—Where the will in question contained certain charitable bequests, concerning the validity of which the contestants were permitted to introduce evidence on the trial of the contest, it was error to refuse an instruction, requested by the proponent, to the effect that questions as to the legality or illegality of any of the clauses of the will were immaterial at that time, and that the jury were not to consider any question concerning the legality of any charitable bequest.

ID.—PRESUMPTION OF SANITY.—It was error for the court to refuse to instruct the jury that it is a presumption of law that every person is of sound mind until the contrary is proved, and that it was also a presumption of law that the testator was of sound mind at the time he executed the instrument offered for probate.

ID.—RIGHT OF TESTAMENTARY DISPOSITION—FAILURE TO PROVIDE FOR CHILDREN—RIGHTS OF HEIRS IN PROPERTY OF ANCESTOR—JUSTNESS OF WILL.—On such contest the proponent was entitled to have given instructions touching the right of every person of legal age and mental capacity to dispose of his property by will, in the form approved in *Estate of Dolbeer*, 149 Cal. 227; that no presumption of insanity arose merely because the testator made no provision in his will for his children; that the heirs of the deceased had no vested rights in the property of their ancestor because of their relationship; that if the jury found that the testator was of sound mind, it could make no difference in their verdict, whether they believed the provisions of his will to be just or unjust, equitable, or inequitable, and that their verdict must be rendered upon the evidence, eliminating sympathy, pity, and prejudice, or a desire to do charity.

ID.—APPLICATION OF SECTION 4½ OF ARTICLE VI OF CONSTITUTION.—Section 4½ of article VI of the constitution cannot be applied to uphold the decree refusing probate of the will in question.

APPEAL from a decree of the Superior Court of the City and County of San Francisco refusing to admit a will to probate. Thomas F. Graham, Judge.

The facts are stated in the opinion of the court.

Pillsbury, Madison & Sutro, Alfred Sutro, and Felix T. Smith, for Appellant.

Neal Powers, and J. C. Flannery, for Respondents.

HENSHAW, J.—The will of Michael Martin was offered for probate by the Savings Union Bank and Trust Company, a corporation, named in the will as executor thereof. A contest over the admission to probate of this will was instituted by the three adult children of the deceased,—two married daughters, Ellen Taylor and Ann Lowney, and one unmarried son, Frank H. Martin. The contest was heard and determined before a jury. The sole ground of contest presented to the jury's consideration was that of the unsoundness of mind of the testator. The jury's verdict declared the

will to be the product of an unsound mind. The trust company prosecutes this appeal.

At the time of the execution of this will, July 13, 1912, Michael Martin was seventy-seven years of age. About six months thereafter he died at the Emergency Hospital in San Francisco from injuries occasioned by a collision with a horse and wagon. By his will he recognized that all of the property owned by him was community property. The moiety over which he had the power of testamentary disposition· he left in part to his sister, creating a trust fund for her benefit during her lifetime. The corpus of the trust upon her death, with all the remainder of his property, he put into another trust for the benefit of unnamed grandnephews and nieces, children of his nephew Charles Lane. The latter trust was to end when the youngest of these grandnephews and nieces surviving attained the age of twenty-one years, and in the event that all died before any attained this age, the trust was to determine, and two-thirds of the corpus of the trust was to go to charity and one-third to his heirs at law. Besides the collateral kin, to whom all of his property was thus bequeathed and devised, he left sixteen descendants of his own blood and that of his wife,—three children, ten grandchildren, and three great grandchildren. All of these were disinherited.

Appellant's first contention is that the evidence is wholly insufficient to show an unsoundness of mind, or at least an unsoundness of mind sufficient to warrant the refusal to probate the will upon the ground of the testamentary incapacity of the deceased. This contention we think cannot, under the evidence, be sustained. The contestants showed that their father and mother married in Buffalo, New York, in 1857. Children were born to them. They lived together in New York until 1870, when the family came to San Francisco. Michael Martin was a ship calker by trade, was exceptionally industrious and devoted long and indeed excessive hours to his labor. He and. his wife were frugal and thrifty. By their savings and investments through the long years there was accumulated much property. But with his industry and working activity Michael Martin was given to brooding and to unexplained fits of violent temper, when, without provocation, he would abuse his wife, at times striking her. After his arrival in San Francisco he there maintained his family,

though a large part of his time was spent in following his trade at Seattle and other points on Puget Sound. In this home his daughters resided with him until they married. In 1899 in his home besides himself were his wife and their one son, Frank, then about nineteen years of age. In the autumn of that year he took his usual departure for Puget Sound. There had been no quarrel between the spouses, no difference at all, to the knowledge of the wife or any of the children. Upon the night preceding his departure he and his wife occupied, as usual, the same bed chamber. She had prepared and both had partaken together of their breakfast. After this meal he told her that he was going back to Puget Sound and asked her to pack his traveling effects in a small suit case. This she did. All his other apparel and belongings remained as usual in the house. He bade her good-bye, departed, and never thereafter returned to his home. He never thereafter held any manner of communication with her; never voluntarily saw her, and fell into violent and uncontrollable passion at the sight of her, or of her picture, or even at the mention of her name. This continued until his death. During the years that elapsed after his departure and before his death he maintained relations of apparent love and intimacy with his children. His children and his son-in-law Lowney, with whom he was also on cordial terms, repeatedly asked for explanations of his strange behavior and conduct, but these questions served only to excite him greatly and his constant and reiterated answer was "you know, you know." He neither explained nor did he ever return. The abandoned wife knew no more than did the children of any cause justifying or explaining the husband's conduct. The pleadings of his wife and children and grandchildren that he account for his strange conduct and return home were futile. The son-in-law testifies as follows: "Every time his wife's name was mentioned he would go into a furious rage and shake himself in a frightful manner, his eyes would become bulging; other times he would ashen in the face, until finally he forbid me to mention her name." In these later years he was suffering from a spinal trouble and wore a brace. He worried and brooded until he "lost sleep and was in such a nervous state that he was miserable, and really he was an object of pity almost." While formerly neat and careful of his attire, latterly he grew heedless and went about

unkempt and dirty, wearing his spinal brace outside of his
clothes. The fire marshal of San Francisco, who had known
the deceased since 1874, testified that he "was getting worse
every time he came to the office"; that while formerly a man
of cleanly appearance and dress "of late years he used to
come into my office looking very shabby." Upon these later
visits the deceased would "sit away over in a corner of the
room staring at you. You would not sometimes know
whether he was looking at you or over your shoulder at some-
body else." Upon asking him questions "sometimes he
would make no answer, and sometimes he would. I usually
let him go. I did not interfere with him at all." In the
unexplained rages into which he would fall over the men-
tion of his wife's name, or at the sight of her picture, he
would stand with livid face, gesticulating violently and mut-
tering to himself, "I will fix her, I will fix her." There is
not a suggestion in the case that the wife had ever during
the more than fifty years of their married life been anything
but a true wife, a devoted wife, a frugal wife, and a faithful
mother. In 1902 his daughter, Mrs. Lowney, in Saint Boni-
face church, suggested a reconciliation between the father
and mother, and the father's rage became so violent and so
noticeable that the sexton approached and requested him to
leave the sacred edifice. Many other instances and examples
of abnormality were given in evidence. He would rise from
his bed and light the gas throughout the house for no known
reason and would relight it when it was extinguished. He
would slam the doors of the house throughout the night,
stand on the street and stare vacantly for long periods of
time, hide beneath the steps of his home, ramble in his con-
versations,—indeed it would prolong this statement of facts
beyond the necessities of the case to itemize all of the evi-
dences of paranoea contained in the testimony of contestants.
His relations with his children continued friendly and affec-
tionate. Indeed upon his periodical returns to San Fran-
cisco he lived with one or another of his married daughters.
But in one instance, leaving the home of one of his daughters
and passing his wife, who was about to enter, he packed his
effects and removed from the house.

As against this evidence there was, of course, the opposing
evidence of intimate friends, who declared him to be sane;
of the witnesses to the will, who testified that in their observa-

tion Michael Martin was of sound and disposing mind at the time the will was executed. But the contestants' position throughout the case was that the deceased was primarily the victim of a monomania, evidenced by his intense and unwarranted and unexplained hatred of his wife; that this monomania not only influenced and colored all his life, but was actively present and operative in the testamentary act; and that in addition to all of this, his mental trouble progressed from the stage of monomania until it assumed the form of a general insanity, aided by the decay of his physical and mental powers due to advancing years. There was enough evidence in the case to support the jury's verdict in favor of either of these views.

Appellant urges that the direct and uncontradicted testimony of the condition of the testator's mind at the time of the execution of the instrument establishes that he was of sound and disposing mind, and that this evidence must be considered conclusive upon the question. Reliance herein is placed upon *In re Wilson*, 117 Cal. 262, [49 Pac. 172, 711]. and *Estate of Purcell*, 164 Cal. 300, [128 Pac. 932]. Both of these cases are merely to the effect that the ultimate question for determination is the condition of the mind of the testator at the time of the execution of the will, and that while evidence of the condition of his mind before and after the date of the testamentary act is admissible, it is relevant and important only for its bearing upon the condition of mind when the will is executed. But this unimpeachable principle is far from supporting the position of appellant, as is very clearly shown by *Estate of Jones*, 166 Cal. 108, [135 Pac. 288].

It is further urged and argued by appellant that the mere fact that a will is unjust or even cruel is not evidence of the testator's insanity. So that even if it be assumed that there was such an animosity between the deceased and his wife as to have amounted to an insane delusion, such delusion could not have been material, as it did not operate to produce the will in question, and to this proposition appellant cites *Estate of Morey*, 147 Cal. 495, [82 Pac. 57], and *Estate of Packer*, 164 Cal. 525, [129 Pac. 778]. It is, of course, true that a testator has the right to make an unjust, or an unreasonable, or even a cruel will, and that no will may be legally set aside upon the mere establishment that it is such a will.

But, upon the other hand, it is equally true, as declared in such cases as *Field* v. *Shorb,* 99 Cal. 661, [34 Pac. 504], and *Estate of Wilson,* 117 Cal. 262, [49 Pac. 172], that where a man wills all or most all his property away from his wife or children with whom he has lived on apparently friendly terms, that fact has weight in determining the mental condition of the testator. And if a man has lived in apparently the most affectionate relations with his family and leaves a will in which his property is given to others, and no reason is suggested or explanation made why they are thus disinherited, in *Estate of Wilson,* 117 Cal. 262, [49 Pac. 172], it is said, "this circumstance could certainly tend to show delusion or alienation of reason at the time of the testamentary act." But (so appellant argues), testator's will furnishes no evidence of insanity; it was drawn by skilled men, under specific directions from the testator, who, justified in the belief that his wife would make provision for their children and descendants out of her half of the community property, felt that he with his share of it should make provision for his aged sister and her descendants. Even so, it is a fair argument that the ties of kinship binding one to his direct lineal descendants are naturally stronger than similar ties holding one to those of collateral blood. And respondents, in turn, argue that their disinherison was the direct result of their father's monomaniacal hatred of their mother which prompted him to cut off all of his lineal descendants, because in their veins, with his blood, flowed that of their mother, whom he abhorred. This, too, was a reasonable argument to be addressed to the jury, and expressed a reasonable inference which the jury might draw from the evidence in the case.

No small part of the evidence was presented by the depositions of witnesses at Seattle or elsewhere upon Puget Sound, who had known and had dealings with the deceased. Of the manner of the presentation of the evidence of these depositions appellant makes serious and just complaint. The cause was being tried before a jury. The single issue was the testator's mental unsoundness. The evidence was sharply conflicting. In the case of each witness, of his deposition on file, counsel for proponent and counsel for contestants each had a copy. The practice adopted was, upon the examination of contestants' witnesses, for contestants' counsel to

read the direct examination and proponent's counsel to read the cross-examination. No one familiar with the practice of our law need be informed of the vast amount of irrelevant, immaterial, and incompetent matter which finds its way as evidence into such depositions. They are not taken before an officer who may rule out such objectionable matter, and there is no check therefore upon its admission. Such is the condition presented by these depositions. Moreover, in addition to the asking of improper questions eliciting immaterial, irrelevant, or incompetent matter, it will often happen in the taking of depositions, even upon settled interrogatories, as it occurs in court when a witness is testifying *viva voce,* that the answer to a pertinent question will itself be impertinent. When contestants' depositions were about to be read, proponent's counsel repeatedly urged the court to scan the depositions as they were being read, so that the court could intelligently rule upon the objections that would be made to the introduction of many of these answers, upon the ground that they were irrelevant, immaterial, and incompetent; that if the court did this and sustained the objections it would prevent the introduction to the jury of these improper matters; that if the court refused to do this and permitted the answer to be read, the effect of the answer would still be left upon the jurors' minds, even though the answer was subsequently stricken out, and furthermore, proponent's counsel would be put in the unfortunate position of having to object to evidence which to the jury might seem to have a legitimate bearing upon the issue, and so unduly would proponent's case be prejudiced. Notwithstanding the reasonableness of this request, the court refused utterly to entertain it. The result was that a mass of incompetent matter was thus read, heard, and considered by the jury. Why the court should have taken the position which it did is not made plain. It is purely by reason of an infirmity in our method of receiving evidence that a witness testifying orally may give an irrelevant or impertinent answer to a relevant and pertinent question. It is deplorable that this should be, but it is an inherent vice in our system of judicial investigation, and so must be borne with equanimity. But never, where it can be avoided, is it permitted. No written document offered in evidence is ever read aloud before a jury until the court has inspected it and ruled upon its admissibility. The same

reasoning demands the application of the same rule to deposi-
tions, and the saneness and soundness of the rule are so
apparent that we feel justified in saying that it is the
universal practice, as it certainly should be, of our trial
courts.   Many cases have been reversed for the persistence
of attorneys in asking improper questions, even when ob-
jections to those questions have been sustained and no an-
swers have been given, or where the answers in and of them-
selves have been harmless.   Appellate courts uniformly re-
verse cases for such abuses when it appears from the attor-
ney's pertinacity that the design is, as is said in *People* v.
*Wells,* 100 Cal. 459, [34 Pac. 1078], "to prejudice the jury
against the defendant in a vital matter by the mere asking
of the question."   With added force does this reasoning
apply in the case of depositions taken without limitation
either as to the questions asked or as to the answers given.
The misconduct of the latter class of cases, where the evi-
dence is admitted, is certainly greater than in the former
class of cases where only the questions are asked.   Yet in
the former class of cases, whether they be criminal or civil,
the courts have unhesitatingly denounced the practice and
reversed the cause for this unfairness amounting to miscon-
duct.   (*People* v. *Devine,* 95 Cal. 227, [30 Pac. 378] ; *People*
v. *Mullings,* 83 Cal. 138, [17 Am. St. Rep. 223, 23 Pac. 229] ;
*People* v. *Wells,* 100 Cal. 459, [34 Pac. 1078] ; *People* v. *Un
Dong,* 106 Cal. 83, [39 Pac. 12] ; *People* v. *Derwae,* 155 Cal.
592, [102 Pac. 266] ; *Waldron* v. *Waldron,* 156 U. S. 361,
[39 L. Ed. 453, 15 Sup. Ct. Rep. 383] ; *Koelges* v. *Guardian
Ins. Co.,* 57 N. Y. 638; *Evans* v. *Town of Trenton,* 112 Mo.
390, [20 S. W. 614] ; *Hall* v. *Wolf,* 61 Iowa, 559, [16 N. W.
710] ; *Lindsay* v. *Pettigrew,* 3 S. D. 199, [52 N. W. 873] ;
*Tucker* v. *Hennicker,* 41 N. H. 317.)   To what has already
been said it must, of course, be added that while the pro-
cedure by the court in refusing to rule until the answers
were actually read before the jury was error, if the answers
themselves were noninjurious to proponent's case, the error,
though persisted in, would not demand a reversal of the
case.   But here the answers were in many instances not only
highly improper but highly injurious.   Thus one of con-
testants' witnesses, speaking of the deceased's peculiarities,
says: "I believe it was due to the fact that he was worried
over business matters wholly, and I thought that possibly he

had been drinking somewhat in the last few years of his life and it made some change in his manner different from what it was when I first became acquainted with him." The court refused to prevent the reading of this answer to the jury, as it refused to prevent the reading of all other answers, but on motion made after the reading struck it out. Further examples, but by no means all, of like instances will be found in the following quotations: He had "rather the attitude of one who was suspicious of everybody. That was about what I would take it to indicate. Not that I have any knowledge of that fact, but I would judge it to be the case from his attitude." "He would not recognize people that he would meet, apparently in a deep study, worrying over whether he was going to lose what he had invested, or whether he was going to make anything on it." "Well, he would have probably had his mind made up for a long time as to the disposition of his property, and I don't believe that he had any idea that he was going to die anywhere as soon, and I don't think he had the will made until the last few years." "And the last four or five years I was satisfied in my own mind that he was losing his mind." "You may think it is funny how I would know about his being mentally off, but I studied medicine for quite a while." "I was going to tell you he went crazy and he used to come into the office. There was no doubt in my mind—I was satisfied from his general appearance that he was losing his mind." "I have heard it often remarked if times did not get better and ships pay something, Mike Martin will be in Steilacoom. That is what you would hear, common talk." "Q. So when those remarks were passed about him (concerning Steilacoom) it meant in this community that he would be in the hospital for the insane?"

We have not attempted to give all the instances, but sufficient have been noted to show the highly injurious character of the evidence which the court thus improperly admitted to the jury.

Much other improper evidence was admitted, to which brief reference may be made in contemplation of the reversal which must be ordered. Intimate acquaintances, by virtue of the existence of such intimacy, are permitted to testify and to give their opinion upon the question of the sanity or insanity of the deceased, and the weight of this opinion evidence in

each instance depends upon the facts forming the basis of it.
But upon other matters their opinion evidence is of no legal
value and is inadmissible. (*Estate of Taylor,* 92 Cal. 564,
[28 Pac. 603]; *In re Coburn,* 11 Cal. App. 604, [105 Pac.
924].) Witnesses were allowed to answer whether or not in
their opinion the deceased was "capable of transacting busi-
ness"; whether or not the deceased carried on "conversations
the same as any normal person, or was he abrupt; would he
change the subject quickly?" And answers even to such as
the following were permitted: "Q. Assuming that he had
disposed of his property when you had seen him last in 1909
(This assumption was contrary to all evidence. Deceased
had not done so), and assuming that he was in the same con-
dition in July, 1912, when he had disposed of it, what would
you say as to whether or not he would dispose of his property
freely and voluntarily, or would be controlled by prejudice
or influence formed previous to that time?" Again certain
questions purely hypothetical were asked—questions objec-
tionable as not calling for expert evidence, as not being ad-
dressed to those from whom opinions as experts were proper
to be received, and asked upon cross-examination under cir-
cumstances where they were further objectionable as in no
way being cross-examination. Thus Mr. Clarke, the assistant
secretary of the proponent, testified to the facts within his
knowledge in connection with the making of the will. He had
expressed no opinion touching the sanity or insanity of the
testator. He was not an alienist. He was not an intimate
friend of the deceased. On cross-examination this question
was permitted: "Now, suppose it should appear that this old
gentleman, every time that he beheld a picture of his wife
or on nearly all occasions when he beheld a picture of his wife
in the house of any of his children or his grandchildren, that
he would stand before those pictures at times and go into
a rage and at other times he would stand before those pictures
and stare at them—at the picture of his wife—and stare at it
without making any comments at all, and would stand for
minutes at a time, working his hands so, behind his back,
and he would become nervous and shake all over, and become
agitated to a degree—would those sights and actions of his
cause you to have any change in your opinion as to his sound-
ness or unsoundnes of mind?" Again on cross-examination
a similar hypothetical question was asked witness Beaton,

who, as an intimate friend of the deceased, had testified that in his opinion he was sane. An intimate friend or acquaintance is allowed to give his opinion upon the general question of sanity or insanity only because his familiar intercourse has put him in possession, or is supposed to have put him in possession, of knowledge of a great many facts and incidents too numerous to mention, some of which indeed may have escaped his recollection, but the resultant conclusion from all which the witness is allowed to give. The weight and value of the evidence in each particular instance of course depends upon the range of his knowledge, the intimacy of his intercourse and the statement of the facts upon which his conclusion is based, which facts may be developed upon direct, upon cross-examination, or upon both. But he does not appear before the court as a general expert upon mental diseases. He is not an alienist, and therefore it is improper to submit to him hypothetical questions, and erroneous to receive his answers to them; improper to submit such questions because they are incompetent as addressed to the witness, and are manifestly but self-serving to the questioner in arraying and rearraying facts and purported facts in condensed form for the sake of impressing the jury; erroneous in receiving an answer to such questions because the witness is not competent to speak upon the subject. As is well said (17 Cyc. 83) : ''In general if constituent impressions are so many, interwoven, subtle, or illusive as to prevent proper presentation to the jury or suitable co-ordination by them, the witness may state his inference or conclusion, preceding or otherwise accompanying it by a detailed enumeration of such facts as permit of individual statement. . . . It follows that a directly percipient witness cannot testify on the basis of hypothetically stated facts established by the evidence of other witnesses.'' It was error, therefore, to permit these questions to be asked and answered.

Upon cross-examination of proponent's witnesses the court, over the objection of proponent's attorney, permitted the contestants to carry these witnesses with ceaseless reiteration through endless matters concerning which they had testified that they knew nothing. For example, one of proponent's witnesses was asked upon cross-examination: ''Did he tell you whether his wife was living or dead? A. No. He never told me anything about his family.'' Yet the interrogatories pro-

ceeded and were allowed over objection as follows: "He did not tell you whether he was a widower or not. Did he ever tell you how many children he had or grandchildren or great grandchildren? Did he ever tell you whether he was childless or that he had any children? Did he ever tell you that he was living at 1386 Masonic Avenue in this city with his daughter, Mrs. Lowney, from sometime in 1906 until sometime in 1908? And he never told you when you saw him shortly before his death that he was living with his daughter, Mrs. Taylor, at Santa Clara?" Something of latitude may be permitted in legitimate cross-examination. But when questions, of which these are a sample, are asked of witness after witness, who disclaim any knowledge of the matters, and the questions are continued down to the intimate details of the life of the deceased and his relations with his children and his grandchildren, it becomes manifest that their purpose is not to elicit any facts, but to make weight, to create an atmosphere before the jury. There is in this record presented an extreme case where the court indulged contestants in this form of examination beyond all bounds of pertinency or reason, and the same is true of much of the testimony elicited upon direct examination of contestants' own witnesses. Of this the following must serve as an exemplar, for otherwise the body of this opinion would be swelled well nigh to the limits of the transcript of the evidence:

"A. Myself, and I was taking my little nephew down in my arms into the parlor.

"Q. You say you took your little nephew down in your arms? A. Yes, sir.

"Q. How old is he? A. About three years old.

"Q. Is that a grandchild of your father?

"A. A great-grandchild.

"Q. And you and Mrs. Martin and your father and this little nephew—what is his name? A. Hilary.

"Q. You carried him down the steps? A. Yes, sir.

"Q. What, if anything, was done on that occasion?

"A. I carried him down and I went into the front room where my father was standing, and I said 'Hello, pa,' and I said to Hilary, 'Are you going to say hello to grandpa,' and the little fellow put out his hand and my father shook it and he said, 'A great little boy.' And with that my sister came into the room and I left."

It is not practicable for this court, as has been intimated, to set forth in detail all of these objectionable matters, and the admonition must suffice for the guidance of the trial court that the testimony upon direct and cross-examination be limited within the well-defined bounds of materiality, relevancy, and competency.

Hostility existed between Jeremiah Lowney, a witness for proponent, and his brother, D. D. Lowney, son-in-law of the deceased, and one of the principal witnesses for respondents. Once more it must be said that the evidence of this is too long for repetition here. But upon cross-examination contestants' counsel developed the fact of the existence of hostility upon the part of Jeremiah Lowney against his brother, D. D. Lowney, growing out of the former's belief that his brother had cheated him in a commercial transaction by forcing him to sell out his interest in the business in which they had been partners. Having elicited this, a long examination was entered into with permission of the court, over objection, with the introduction in evidence of an agreement of the sale of the partnership interest; of another paper executed by Jeremiah in which he acquits his brother of any improper practices, and declares that he retired from the business voluntarily. All of this evidence was wholly improper, and served in its impropriety but to prejudice proponent's case. "It is competent to prove enmity or unfriendliness of a witness to a party against whom he testifies, as one method of assailing or weakening the evidence. . . . But, the provable fact is the state of the witness' feelings, not the cause of it. That would probably lead to a multiplication of issues, and confusion of the minds of the jurors." (*Polk* v. *State*, 62 Ala. 237. See, also, *Butler* v. *State*, 34 Ark. 480; *Boldon* v. *Thompson*, 60 Kan. 856, [56 Pac. 131]; *Seymour* v. *Bruske*, 140 Mich. 344, [103 N. W. 613, 104 N. W. 691]; *Chelton* v. *State*, 45 Md. 564.)

The court instructed the jury as follows:

"The court further instructs you that in arriving at your verdict it is right and proper for you to consider the postals offered in evidence and sent by the deceased to his daughter, Mrs. Taylor: 1. As to the ability of the deceased to write; 2. As to the ability of the deceased to compose; 3. As to the mental capacity of the deceased; and, 4. As to the feelings entertained by the deceased towards his said daughter, Mrs.

Taylor, at the time that said postals were written, respectively.

"You are further instructed that you may consider the animosity or friendliness of Michael Martin to his children, Mrs. Taylor, Mrs. Lowney, and Frank Martin, the contestants in this proceeding, as of the time of the execution of the will."

These instructions are objectionable as singling out and bringing into prominence before the jury certain isolated facts and thereby, in effect, intimating to the jury that special consideration should be given to those facts. In *People* v. *Hawes*, 98 Cal. 648, [33 Pac. 791], a proposed instruction was refused and this court justified its refusal for the reasons above given, because it "singled out and gave prominence to certain portions of the evidence." (See, also, *Rainey* v. *Kemp*, 54 Tex. Civ. App. 486, [118 S. W. 630] ; *Dupree* v. *Texas & Pac. Ry. Co.*, (Tex. Civ. App.) 96 S. W. 647.) The sole issue in this case was the soundness or unsoundness of mind of the testator and its effect upon his testamentary act. But the court instructed the jury that in arriving at their verdict this, the one vital matter, is but one of four or five specific matters which they are to consider.

In his opening statement to the jury contestants' attorney made charges of undue influence, fraud, and the improper execution of the will, these matters being embraced within the grounds of the original contest, though they were abandoned at the trial, upon which, as has been said, the sole issue was that of mental capacity. The proponent asked an instruction to the jury that these grounds of contest had been abandoned. The court, for no apparent reason, but certainly erroneously, refused so to advise the jury.

Again, upon his opening statement, contestants' attorney analyzed the trusts in the will to the jury, contending that by the will two-thirds of the testator's property was given to charity and but one-third to his heirs, and further stating to the jury that the court would instruct them "as to the law in this matter, that a testator leaving heirs cannot devise or bequeath more than one-third of his property to charity, although this testator attempts to devise two-thirds of his property to charity." Objection was made to this, nevertheless it was carried into the case by an examination of one of the witnesses who drew the will, as to whether or not he had ad-

vised the testator that he was giving to charity more than the law permitted, and much more to like effect. Proponent asked for an instruction as follows:

"Questions as to the legality or illegality of any of the clauses of this will do not concern you or the court at this time, and there is not before you for consideration any question concerning the legality of any charitable bequest in the will."

This instruction was refused, though it should have been given.

Again proponent asked the court to give an instruction unimpeachable in point of law as to the presumption of sanity; that "it is a presumption of law that every person is of sound mind until the contrary is proved," and that it was a presumption of law that Michael Martin was of sound mind at the time he executed the instrument offered for probate. Such unquestionably is the law. (*Estate of Nelson,* 132 Cal. 182, [64 Pac. 294]; *Estate of Dolbeer,* 149 Cal. 227, [9 Ann. Cas. 795, 86 Pac. 695]; *Estate of Loveland,* 162 Cal. 595, [123 Pac. 801]; *Estate of McCrellish,* 167 Cal. 711, [L. R. A. 1915A, 443, 141 Pac. 257].) It was error to refuse this instruction.

The proponent offered another instruction, unimpeachable in point of law, touching the right of every person of legal age and mental capacity to dispose of his property by will. The instruction was refused. It was a proper instruction (*Estate of Nelson,* 132 Cal. 182, [64 Pac. 294]; and was the precise instruction given in *Estate of Dolbeer (Estate of Dolbeer,* 3 Coffey Probate Dec. 232), and approved by this court. (*Estate of Dolbeer,* 149 Cal. 227, [9 Ann. Cas. 795, 86 Pac. 695].

So also was the proponent entitled to its proposed instruction that no presumption of insanity arose merely because Michael Martin made no provision in his will for his children.

Proponent's proposed instruction that the heirs of the deceased had no vested rights in the property of their ancestor because of their relationship was sound and the refusal to give it was not justified. Nor was the refusal of the court to instruct the jury justified, where the proposed instruction declared that if they found that Michael Martin was of sound mind it could make no difference in their verdict, if they believed the provisions of his will to be just or unjust, equitable

or inequitable; and the same is true of the further instruction proposed and refused to the effect that their verdict must be rendered upon the evidence, eliminating sympathy, pity, and prejudice or a desire to do charity.

To the complaint which proponent makes over the court's refusal to give these instructions, contestants make no answer whatsoever, unless it be said that their suggestion that section 4½ of article VI of the constitution should be applied to support the decree thus obtained. For obvious and manifest reasons this cannot be done.

The decree appealed from is reversed.

Melvin, J., and Lorigan, J., concurred.